Nereus MONTEMAYOR, Appellant,

v.

SEBRIGHT PRODUCTS, INC.,
d/b/a/ Bright Technologies,
Respondent,

v.

VZ Hogs, LLP, Third Party Defendant.

A15-1188

Supreme Court of Minnesota.

Filed: July 12, 2017

Paul R. Dahlberg, Patterson Dahlberg, Rochester, Minnesota, for appellant.

R. Stephen Tillitt, Marissa K. Linden, Gislason & Hunter LLP, Minneapolis, Minnesota, for respondent.

Charles A. Bird, Grant M. Borgen, Bird, Jacobsen & Stevens, P.C., Rochester, Minnesota, for amicus curiae Minnesota Association for Justice.

Gregory Merz, Gray Plant Mooty, Minneapolis, Minnesota; and Deborah J. La Fetra, Sacramento, California, for amicus curiae Pacific Legal Foundation.

## OPINION

MCKEIG, Justice.

In this case, two long-established rules come together. First, in a negligence case, when the issue of reasonable foreseeability of the injury is close, it should be decided by the jury. Second, on a motion for summary judgment, all facts and the inferences arising from them must be considered in the light most favorable to the non-moving party.

Here, appellant Nereus Montemayor was injured as he attempted to manually clear a jam from an extruder manufactured by respondent Sebright Products, Inc., while his co-worker simultaneously operated the extruder. Montemayor brought a products liability action against Sebright, alleging failure-to-warn and design-defect claims. The district court granted summary judgment to Sebright, concluding that Sebright did not owe a duty of care to Montemayor because Montemayor's injury was not reasonably foreseeable. Montemayor appealed, and the court of appeals affirmed. We conclude that, viewing the evidence and the inferences arising from it in the light most favorable to Montemayor, reasonable persons might differ as to the foreseeability of Montemayor's injury. Accordingly, this is a "close case" in which foreseeability must be resolved by the jury. We therefore reverse and remand.

## FACTS

In August 2011, Montemayor was hired as a laborer for VZ Hogs, a family-owned company near Claremont that raises hogs and produces hog feed. To make hog feed, VZ Hogs processes discarded food using a high-density extruder manufactured by Sebright. Food containers are placed into the extruder's hopper chute. The extruder crushes the containers using a hydraulic ram. Liquids are then siphoned into large storage tanks, while empty containers are pushed into a discharge-chute area. A hydraulically powered press or "plenum" compresses the empty containers before they are forced through the discharge chute and into a separate compactor machine.

Sebright shipped the extruder to VZ Hogs in 2008 with the control panel attached to the machine. The design of Sebright's extruder enabled users to relocate the control panel to a remote operating location; however, Sebright did not advise users regarding the safe relocation of the control panel. The extruder's control panel is equipped with a locking selector switch, requiring a key to operate the extruder. The extruder manual states that only authorized personnel should have access to the key, and the extruder should be locked to "off" when not in use.

The manual instructs only "thoroughly trained personnel" to operate the extruder and cautions users to ensure that no one is inside the extruder before operating it. The manual also provides instructions on clearing jams that may occur inside the extruder. It suggests that users place pieces of timber inside the extruder's hopper, and then use the control panel to run the machine in manual mode.

Finally, both the manual and warning labels on the extruder warn users to employ "lockout/tagout" procedures before entering the extruder. Occupational safety regulations require employers to establish and implement lockout/tagout procedures to ensure that workers disable all sources of energy before entering a machine. Typically, employers place lock boxes on the power outlets, and provide workers with their own padlock and key. Workers who need to enter a machine are instructed to disable the power at the source, and then place their padlock on the lock box so that no one can restore the power until the worker removes his lock. Warning labels above the extruder's discharge chute read "Follow Lockout/Tagout Procedures Before Entering," and "Danger: Do Not Enter."

On September 8, 2011, approximately one month after Montemayor started working for VZ Hogs, the extruder stopped functioning and appeared to be jammed with materials. Employees tried to clear the jam by pulling materials out with a pitchfork, but they were unsuccessful. The next morning, supervisor Ryan Cowell instructed Montemayor and his co-worker Anthony Burmea to clear the jam. According to Burmea, Cowell told him and Montemayor to "just clean it out" or "just unjam it" without further instruction. Cowell later told another VZ Hogs employee, Brian Gray, to try to clear the jam.

Although VZ Hogs had a safety manual and held periodic safety trainings, Montemayor had not received training on lockout/tagout procedures or on clearing jams within the extruder. Montemayor also had not read the extruder manual. Cowell testified that he would typically put the key to the locking selector switch in his pocket to disable the power to the extruder while workers performed maintenance on it; however, the key was broken off inside the keyhole, locking the extruder in the "on" position.

Montemayor and Burmea climbed into the compactor next to the extruder's discharge chute and attempted to clear the jam. They continued to clear materials from the discharge chute using a pitchfork. Once the materials were too far inside the discharge chute to reach them with the pitchfork, they took turns crawling inside the chute on their stomachs and pulling materials out by hand. Neither Montemayor nor Burmea saw the warning labels above the discharge chute or disabled the power to the extruder.

While Montemayor was inside the discharge chute, Gray went to the extruder's control panel to try to clear the jam mechanically. VZ Hogs had relocated the control panel from the extruder to an elevated room with a view over the top of the extruder. From that position, Gray could

see Burmea standing in the compactor next to the discharge chute, but could not see Montemayor inside the discharge chute. Gray ran the extruder in manual mode, and the plenum located inside the discharge chute crushed Montemayor's legs.

As a result of the accident, both of Montemayor's legs had to be amputated above the knee. Minnesota's Occupational Safety and Health Division penalized VZ Hogs more than $18,000 for violating regulations by failing to train employees on basic safety precautions, including lockout/tagout procedures, and for allowing a machine to be started with someone inside.

Montemayor brought a products liability action against Sebright, alleging that (1) Sebright's extruder design was defective because it allowed for the relocation of the control panel without proper visibility of the discharge chute and did not include an alarm and delay upon startup; and (2) Sebright failed to adequately warn of the dangers that led to Montemayor's injury. Sebright brought indemnity and contribution claims against VZ Hogs.

After discovery, Sebright filed a motion for summary judgment arguing, among other things, that it did not owe a duty of care to Montemayor because his injury was not reasonably foreseeable. The parties submitted as exhibits to their attorneys' affidavits the unnotarized reports of three experts: Lanny Berke, for Montemayor; Michael Holmquist, for Sebright; and Dennis Skogen, for Sebright. Neither party objected to the introduction of these reports.[1]

All three experts recognized that VZ Hogs' negligence in failing to train and supervise its employees contributed to Montemayor's injury. Berke and Holmquist also agreed that Sebright foresaw the possibility of a worker entering the extruder to perform maintenance. The experts disputed whether Sebright should reasonably have foreseen Montemayor's injury.

Berke opined that it was reasonably foreseeable that a worker might not disable the power to the extruder before performing maintenance. He noted that Sebright's own warnings instructed users to perform lockout/tagout procedures before entering the extruder. Further, Berke concluded that Sebright's negligence made Montemayor's accident more likely. According to Berke, Sebright failed to (1) instruct users on an adequate method of unjamming the extruder, as the "timbers" method in the manual was insufficient; (2) make the manual readily available to users; (3) provide instructions on the safe relocation of the control panel; (4) perform a proper hazard analysis, including documenting customer feedback; and (5) comply with relevant industry standards for warnings and safety features, such as alarms, set by the American National Standards Institute. Berke stated that a proper hazard analysis would have enabled Sebright to discover the risks of an untrained worker entering the extruder without performing lockout/tagout procedures, an employer positioning the control panel without proper visibility of the discharge chute, and a worker operating the extruder without knowing whether someone was inside it.

Holmquist and Skogen contested each of Berke's conclusions regarding Sebright's alleged negligence. They opined that it was not reasonably foreseeable that Montemayor would crawl inside the compactor and then the extruder without first

---

1. Indeed, Sebright initiated the introduction of the expert reports when it attached the report of Lanny Berke, Montemayor's expert, in support of its motion for summary judgment. Sebright also discussed Berke's report during the summary judgment hearing.

disabling the power, in violation of safety regulations as well as Sebright's warnings. According to Holmquist and Skogen, Sebright's lockout/tagout warnings established that Sebright performed a thorough hazard analysis, discovered the risk of a worker entering the extruder with the power connected, and took adequate measures to protect against this risk. They further concluded that Sebright's design and warnings satisfied relevant industry standards.

▬ The district court granted Sebright's motion for summary judgment, concluding—without mentioning the expert reports—that Sebright did not owe a duty of care to Montemayor. Although the court found that it was reasonably foreseeable that a person may physically enter the extruder or activate it from the control panel to clear a jam, it found that it was not reasonably foreseeable that two people would attempt these two methods simultaneously. The court of appeals affirmed. *Montemayor v. Sebright Prods., Inc.*, No. A15-1188, 2016 WL 1175089, at *4 (Minn. App. Mar. 28, 2016). We granted Montemayor's petition for review on the issue of foreseeability.[2]

## ANALYSIS

▬ We review the grant of summary judgment de novo to determine "whether there are genuine issues of material fact and whether the district court erred in its application of the law." *Stringer v. Minn. Vikings Football Club, LLC*, 705 N.W.2d 746, 754 (Minn. 2005); *see also* Minn. R. Civ. P. 56.03. In doing so, we must not "weigh facts or determine the credibility of affidavits and other evidence." *Stringer*, 705 N.W.2d at 754. "[S]ummary judgment is a blunt instrument" that is "inappropriate when reasonable persons might draw different conclusions from the evidence presented." *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008) (citations and internal quotation marks omitted). Thus, the moving party has "the burden of showing an absence of factual issues," and "the nonmoving party has the benefit of that view of the evidence most favorable to him." *Lowry Hill Props., Inc. v. Ashbach Constr. Co.*, 291 Minn. 429, 194 N.W.2d 767, 769 (1971). "All doubts and factual inferences must be resolved against the moving party." *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn. 1981). "Expert testimony ... at the summary judgment stage may create genuine issues of fact." *Anderson v. Dep't of Nat. Res.*, 693 N.W.2d 181, 191 (Minn. 2005).

## I.

▬ Failure-to-warn and design-defect claims are separate causes of action,

---

**2.** The district court held, in the alternative, that (1) Montemayor's failure-to-warn claim failed on the merits because Montemayor did not read the warnings Sebright provided, and (2) Montemayor's design-defect claim relating to the control panel failed on the merits because VZ Hogs altered the control panel after it left Sebright's control. These issues were raised and argued to the court of appeals, but the court did not address them. *See Montemayor*, 2016 WL 1175089, at *4 n.3. Montemayor's petition for review raised only the issue of foreseeability, and Sebright did not file a petition for conditional cross-review. *See* Minn. R. Civ. App. P. 117, subd. 4. Montemayor nonetheless included arguments on the district court's alternative grounds in his brief to our court. Sebright moved to strike these additional arguments as beyond the scope of the appeal.

Generally, we "will not address issues that were not specifically raised in the petition for review." *Tatro v. Univ. of Minn.*, 816 N.W.2d 509, 515 (Minn. 2012). Although we retain the discretion to consider issues not raised in the petition in certain circumstances, *id.*, we decline to do so here. We therefore grant Sebright's motion to strike, and remand this case to the court of appeals for consideration of the parties' arguments regarding the district court's alternative holdings.

but each requires the manufacturer to owe a duty of care to the injured party. *Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 467 (Minn. 1988) (failure to warn); *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 624 (Minn. 1984) (design defect); *see also Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011) (describing the issue of duty as a "threshold question" to be determined before liability is considered). A manufacturer has a duty to design its product to avoid an unreasonable risk of harm when the product is used as intended or misused in a reasonably foreseeable manner. *Bilotta*, 346 N.W.2d at 621. Further, a manufacturer has a duty to warn if it "should anticipate that an unwarned operator might use the machine in a particular manner so as to increase the risk of injury and the manufacturer has no reason to believe that users will comprehend that risk." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 925 (Minn. 1986).

■■■■■ For both design-defect and failure-to-warn claims, a manufacturer's duty "arises from the probability or foreseeability of injury to the plaintiff." *Domagala*, 805 N.W.2d at 26 (failure to warn); *see also Whiteford ex. rel. Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998) (design defect). Although duty is generally a legal question for the court to decide, *Germann*, 395 N.W.2d at 924, it is well established that foreseeability is a question for the jury "if there is a specific factual dispute concerning a manufacturer's awareness of a risk," *Huber*, 430 N.W.2d at 467; *see also Ill. Farmers Ins. Co. v. Tapemark Co.*, 273 N.W.2d 630, 636 (Minn. 1978) ("[W]here

there is a genuine issue as to the existence of special circumstances [indicating foreseeability of the injury], summary judgment for the defendant is inappropriate."). Further, "[w]hen the issue of foreseeability is clear, the courts, as a matter of law, should decide it," but "[i]n close cases, the question of foreseeability is for the jury." *Whiteford*, 582 N.W.2d at 918; *see also Domagala*, 805 N.W.2d at 27 n.3; *Bjerke v. Johnson*, 742 N.W.2d 660, 667-68 (Minn. 2007); *Lundgren v. Fultz*, 354 N.W.2d 25, 28 (Minn. 1984).[3]

■■■■ To determine foreseeability, "we look to the defendant's conduct and ask whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury." *Domagala*, 805 N.W.2d at 27. "If the connection between the danger and the alleged negligent act 'is too remote to impose liability as a matter of public policy, the courts then hold there is no duty.'" *Id.* (quoting *Germann*, 395 N.W.2d at 924). We do not look to "the precise nature and manner" of the injury, but rather to "whether 'the possibility of an accident was clear to the person of ordinary prudence.'" *Id.* (quoting *Connolly v. Nicollet Hotel*, 254 Minn. 373, 95 N.W.2d 657, 664 (1959)).

We have held as a matter of law that an injury is not reasonably foreseeable when the "undisputed facts, considered together," established that the connection between the defendant's conduct and the plaintiff's injury was "too attenuated." *Doe 169 v. Brandon*, 845 N.W.2d 174, 179 (Minn. 2014) (holding as a matter of law that a church's district council owed no

---

**3.** We agree with the dissent that the "close cases" standard does not change our summary judgment standard for questions of foreseeability. It merely reinforces the notion that, in determining whether a dispute of material fact exists, all inferences arising from the evidence must be resolved in favor of the

nonmoving party. *Nord*, 305 N.W.2d at 339. In other words, a case is "close" not only when the evidence presents an explicit dispute of material fact, but also when "reasonable persons might draw different conclusions from the evidence." *Osborne*, 749 N.W.2d at 371 (citation omitted).

duty to protect a plaintiff from a church volunteer's sexual abuse when the council was not responsible for employing or supervising the volunteer); *see also Huber*, 430 N.W.2d at 466-67 (holding as a matter of law that a plaintiff's injury was not reasonably foreseeable when it resulted from the disabling of a permanently affixed safety feature); *Larson v. Larson*, 373 N.W.2d 287, 288-89 (Minn. 1985) (holding that foreseeability "was clear and should have been decided by the court as a matter of law" when the only evidence of foreseeability was a vague comment by an intoxicated person 2 months before the injury).

But when "reasonable persons might differ as to whether the evidence" establishes that the injury was foreseeable, we have consistently submitted the issue to the jury. *Ill. Farmers Ins. Co.*, 273 N.W.2d at 636-37 (holding that a fact issue precluded summary judgment when "reasonable persons might differ" as to the foreseeability of a car being stolen and injuring another person); *see also Bjerke*, 742 N.W.2d at 668 (holding that a fact issue precluded summary judgment on the foreseeability of a sexual abuse when the evidence showed that the defendant observed inappropriate behavior between the victim and assailant before the abuse).

In a case involving facts strikingly similar to those presented here, we upheld the district court's decision to submit to the jury the question of whether it was reasonably foreseeable that a worker would unclog a machine by hand with the power connected. *Parks v. Allis-Chalmers Corp.*, 289 N.W.2d 456, 459 (Minn. 1979). In *Parks*, the manufacturer guarded the dangerous mechanism with a door and warned against unclogging the machine with the power connected. *Id.* at 458. But there was evidence that the manufacturer failed to install a safety mechanism that would have prevented a user from unclogging the machine with the power connected and did not provide a safe method of unclogging the machine. *Id.* at 458-59. We concluded that, in light of this evidence, "[t]he jury could find that defendant knew, or in the exercise of reasonable care should have known, that some users would leave the power connected while unclogging." *Id.* at 459.

Likewise, the United States Court of Appeals for the Eighth Circuit, applying Minnesota law, has upheld a jury verdict imposing liability on a manufacturer for injuries sustained after a worker reached inside a power-connected machine. *Bursch v. Beardsley & Piper*, 971 F.2d 108, 110-13 (8th Cir. 1992). The federal district court in *Bursch* submitted the case to the jury despite evidence that the employer failed to properly train and supervise the plaintiff. *Id.* at 112. The Eighth Circuit concluded that the manufacturer could reasonably foresee the employer's failure to provide the machine's manual to employees and to maintain the machine properly, as well as a co-worker's activation of the wrong switch that resulted in increased injury. *Id.* at 112-13.

Indeed, it is well established that manufacturers can be held liable despite intervening circumstances—such as an employer's comparative negligence, a plaintiff's failure to heed warnings, and the disabling of safety devices—if such circumstances were also foreseeable. *See id.; Germann*, 395 N.W.2d at 925 (holding that the foreseeable removal of a detachable safety device did not negate manufacturer liability); *Parks*, 289 N.W.2d at 458-59 (submitting foreseeability to the jury despite the plaintiff failing to heed the manufacturer's warnings against unclogging a machine with the power connected).

In *Bilotta v. Kelley Co.*, we held that the district court was not required to provide a

jury instruction on superseding causes, even though the employer's violations of occupational safety regulations contributed to the injury, because inadequate safety training was reasonably foreseeable to the manufacturer. 346 N.W.2d at 625. We noted that the manufacturer's quality control manager wrote an article stating that high employee turnover made effective safety training difficult. *Id.* And we stated that, generally, employer violations of occupational safety regulations "cannot be considered superseding causes which relieve a manufacturer of its duty to produce a safe product" as a matter of law; rather, "they are adequately taken into consideration in the comparative-fault formula" after a trial. *Id.*; *see also Johnson v. Niagara Mach. & Tool Works*, 666 F.2d 1223, 1227 n.5 (8th Cir. 1981) (applying Minnesota law and concluding that the manufacturer's expectation that the user will provide a protective appliance "is not sufficient to preclude liability in most circumstances"; rather, the issue "should be decided by a jury").

■ When an employer's violation of occupational safety regulations is not reasonably foreseeable to the manufacturer, however, we have held that the manufacturer is not responsible for ensuring that such regulations are followed. *See Huber*, 430 N.W.2d at 468 (holding that a component manufacturer had no duty to ensure the proper use of safety mechanisms for which regulations assigned responsibility to the employer when noncompliance was not reasonably foreseeable to the component manufacturer).[4]

## II.

■ We now turn to the case at hand. Montemayor argues that this case presents a factual dispute regarding foreseeability and is a close case that the jury must decide. We agree.

Several undisputed circumstances establish that Sebright had, or should have had, some awareness of the risk of Montemayor's injury. It is undisputed that Sebright knew that workers sometimes entered the extruder to perform maintenance. Sebright also provided in its manual a method of unjamming the extruder that involved operating it from the control panel. These facts support the district court's findings that it was reasonably foreseeable that a worker could enter the extruder to unclog the machine or attempt to unclog it using the control panel.

But in finding that it was unforeseeable that the two methods would be used simultaneously, the district court ignored an important undisputed fact: Sebright designed the extruder to allow for the relocation of the control panel and failed to provide any instruction on where it should be positioned so that operators could see dangerous parts of the extruder. Thus, viewing the evidence and the inferences arising therefrom in the light most favorable to Montemayor, a reasonable person could find that Sebright should have foreseen the possibility of a worker operating

---

4. The dissent characterizes *Huber* as our "leading case" on the foreseeability of an employer's failure to adhere to occupational safety regulations. But *Huber* is not directly on point because it addressed the liability of a component manufacturer. Generally, a component manufacturer is liable only for harm caused by the defective component itself. *See* Restatement (Third) of Torts: Prod. Liab. § 5 (Am. Law Inst. 1998). Thus, we were careful to limit our holding in *Huber* to component manufacturers, stating that "[t]his reasoning does not conflict with our prior decisions establishing that the manufacturer of a *finished product* has a duty to warn ultimate users of dangers presented by its product and this duty may not be delegated to an intermediary." 430 N.W.2d at 468 n.2 (emphasis added).

the extruder from the control panel without the ability to observe another worker performing maintenance inside the machine.

Sebright argues that VZ Hogs' negligence—including its failure to comply with occupational safety regulations requiring the use of lockout/tagout procedures and to maintain the extruder's locking selector switch—supersedes any manufacturer liability. But VZ Hogs' comparative negligence does not automatically foreclose Sebright's potential liability for defective design and warnings. Rather, if reasonable minds could disagree as to whether VZ Hogs' negligence was reasonably foreseeable to Sebright, summary judgment must be denied. *See Bilotta*, 346 N.W.2d at 625 ("A defendant is liable, despite an intervening cause, if the cause is foreseeable.").

Here, there is evidence that Sebright recognized and warned against the dangers of failing to use lockout/tagout procedures before entering the extruder. Sebright's own expert, Skogen, stated that "Sebright did identify the potential hazards of servicing and maintaining the machine without proper lockout and tagout

procedures" and "warned against doing so." And Sebright's general manager of marketing, Stuart Sebright, testified that Sebright incorporated the lockout/tagout warnings to comply with new industry standards, which are aimed at addressing "hazard[s]."

Further, as in *Bilotta*, the evidence shows a factual dispute regarding the foreseeability of a user failing to comply with occupational safety regulations requiring the use of lockout/tagout procedures. Montemayor's expert, Berke, concluded—based on a review of the extruder, relevant documentation, and depositions, as well as his experience as a professional engineer—that Sebright should have foreseen the possibility of employees failing to perform lockout/tagout procedures.[5] He found that Sebright did not perform an adequate hazard analysis, which would have uncovered the risk of an untrained employee failing to perform lockout/tagout procedures before entering the extruder. Berke supported this conclusion by noting that Sebright did not document customer feedback as most responsible manufacturers do. Finally, Berke concluded that Sebright increased the risk

---

**5.** Although neither party questions the validity of the expert reports in this case, the dissent challenges our discussion of them here. Both parties submitted unnotarized expert reports as exhibits on summary judgment, certified as genuine by attorney affidavits, and neither party objected to the district court's consideration of the reports. We are not the district court, and it is not for us to make evidentiary rulings on appeal. *See* Minn. R. Civ. App. P. 110.01 ("The documents filed in the trial court ... *shall* constitute the record on appeal in all cases." (emphasis added)); *Anderson v. Twin City Rapid Transit Co.*, 250 Minn. 167, 84 N.W.2d 593, 604 (1957) (considering affidavits submitted on summary judgment despite a hearsay objection on appeal because the affidavits "became a part of the record free from motion to strike by either party").

The fact that the district court did not mention the dueling expert reports does not require us to ignore them. Rather, it raises a red flag that the district court may have overlooked, if not ignored, evidence of a factual dispute (and a close case) when it granted summary judgment to Sebright. The expert reports reflect the opinions of qualified experts who conducted an extensive review of the evidence in this case. *See Gianotti v. Indep. Sch. Dist. 152*, 889 N.W.2d 796, 802 (Minn. 2017) (holding that an expert opinion rests on adequate foundation if the expert was provided "enough facts to form a reasonable opinion that is not based on speculation or conjecture"). It is not for us to weigh the persuasiveness of this evidence against other evidence in the record.

of injury by failing to comply with relevant industry standards, including those calling for startup alarms when there is limited visibility of dangerous areas.

Holmquist and Skogen, also qualified experts who performed an extensive review of the relevant evidence, disagreed. They concluded that Sebright could not have foreseen that someone would ignore its lockout/tagout warnings, and that Sebright performed an adequate hazard analysis and complied with relevant industry standards.

As to the locking selector switch, it is unclear at this stage of the litigation whether VZ Hogs' disabling of this safety feature was a causal factor in Montemayor's accident. Cowell, the supervisor who typically held the key to the locking selector switch, personally directed Gray to attempt to fix the extruder after Montemayor began unclogging the extruder by hand, without first instructing Montemayor to cease his efforts. Although Cowell stated that he would have retained the key to the extruder to prevent it from being operated during maintenance, a reasonable person could find that Cowell would have given the key to Gray so that Gray could attempt to fix the extruder as requested.

Moreover, neither the locking selector switch nor the lockout/tagout procedures are automatic safeguards. Both rely on operators to remove and reattach components to ensure the safe maintenance of the extruder. We have held that it is foreseeable that a user may fail to engage safety features that require the periodic attachment and detachment of the feature. *Germann*, 395 N.W.2d at 925.

Viewing all of the evidence and the inferences arising from it in the light most favorable to Montemayor, there is "a specific factual dispute concerning [Sebright's] awareness of [the] risk" of Montemayor's injury. *Huber*, 430 N.W.2d at 467. Even if there was not an explicit factual dispute in the record, "reasonable persons might differ" as to the foreseeability of Montemayor's injury under the circumstances. *See Ill. Farmers Ins. Co.*, 273 N.W.2d at 637. Accordingly, this is a "close case" that must be resolved by the jury, not the court.

Our holding does not create "bad law" as the dissent argues. Indeed, this result is consistent with our longstanding precedent, discussed above. Moreover, a jury may ultimately find that Montemayor's injury was not reasonably foreseeable, that Sebright was not negligent, or that others were. And manufacturers may still avoid the burden of going to trial when the evidence does not present a factual dispute or a "close case" for the factfinder to resolve. But this is a close case. Were we to end it, we would have to "weigh facts or determine the credibility of affidavits and other evidence." *Stringer*, 705 N.W.2d at 754. That role is properly reserved for the jury.

## CONCLUSION

For the foregoing reasons, we grant Sebright's motion to strike, reverse the decision of the court of appeals, and remand to that court to consider the remaining issues on appeal.

Reversed and remanded; motion to strike granted.

Dissenting, Gildea, C.J., Anderson, Stras, JJ.

## DISSENT

GILDEA, Chief Justice (dissenting).

The circumstances of this case are both disturbing and tragic. But it is not reasonable, as a matter of law, common sense, or public policy, to expect a manufacturer to foresee—absent any admissible evidence—

that the safety device it installed on the machine would be disabled and that an employer would violate multiple safety regulations in using the machine. As the district court said, "bad facts can lead to bad law." The facts of this case are most certainly bad, and the majority has written bad law. Because the majority has written bad law, I respectfully dissent.

This case involves an extruder that Montemayor's employer, VZ Hogs, purchased from Sebright. VZ Hogs uses the extruder to "smash" containers. Montemayor was seriously injured in a workplace accident when, ignoring a warning affixed to the side of the extruder that stated: "Danger: Do Not Enter," he climbed inside the extruder so that he could try to clear a jam, and a co-worker turned the extruder on while Montemayor was inside, despite another warning on the machine that said "lockout/tagout procedures"[1] were to be performed so that the extruder could not be turned on with someone inside.

Montemayor concedes that the negligence of VZ Hogs contributed to the accident. In fact, the government cited and fined VZ Hogs for three separate "serious" violations of basic safety regulations as a result of the accident—the failure to instruct employees in the safe operation of the extruder, the failure to ensure that electrical power was locked out before trying to clear a jam in the extruder, and the failure to verify that all employees were clear of the extruder before restarting it. In addition to these three violations, the safety key that Sebright installed on the extruder so that the extruder could be manually disabled was broken off in the machine after it was received by VZ Hogs, preventing this safety device from being used. Given these undisputed facts, I agree with the district court's and the court of appeals' conclusion that Sebright had no duty as a matter of law because it could not reasonably have foreseen Montemayor's injury. *Montemayor v. Sebright Prods., Inc.*, No. A15-1188, 2016 WL 1175089, at *4 (Minn.App. Mar. 28, 2016).

## I.

Under Minnesota law, "the duty to exercise reasonable care arises from the probability or foreseeability of injury to the plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 26 (Minn. 2011). Whether a manufacturer owes a duty is "a question of law for the court—not one for jury resolution." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986). We have recognized that "[n]early any machine or tool that has any moving parts can be made dangerous if it is improperly used." *Westerberg v. Sch. Dist. No. 792*, 276 Minn. 1, 148 N.W.2d 312, 316 (1967). Consequently, we have imposed on a manufacturer a duty to design "a reasonably safe product," *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 624 (Minn. 1984), and a duty to warn when "it was foreseeable to the manufacturer that the product would be used in a dangerous manner," *Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 467 (Minn. 1988). There is "no duty to

---

1. As the court of appeals described:

   Lockout/tagout procedures are commonly used in industrial settings and intended to safeguard employees while they work in dangerous areas. The basic procedure is that an employee disconnects a machine's power source and then places a padlock on the power switch. The employee keeps the key to the padlock so that no one can acci-

   dentally turn the machine on while the employee is working in the dangerous area. If more than one person is working in the area, multiple locks can be placed on the power source.

   *Montemayor v. Sebright Prods., Inc.*, No. A15-1188, 2016 WL 1175089, at *4 n.1 (Minn.App. Mar. 28, 2016).

warn of an improper use that could not have been foreseen." *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 788 (Minn. 1977). Foreseeability is "ordinarily 'properly decided by the court.'" *Domagala*, 805 N.W.2d at 27 (quoting *Alholm v. Wilt*, 394 N.W.2d 488, 491 n.5 (Minn. 1986)). And we have recognized that "[i]f the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability." *Germann*, 395 N.W.2d at 924. Because Sebright could not have foreseen the improper use at issue, Sebright had no duty under our precedent.

Our precedent dictates that Occupational Safety and Health Administration (OSHA) regulations are of particular relevance in this products liability case. *See, e.g., Huber*, 430 N.W.2d at 468. Under those regulations, it was the responsibility of the employer, VZ Hogs, to ensure that employees were properly trained, 29 C.F.R. § 1928.57(a)(6) (2016), to ensure that employees locked out electrical power before clearing a jam in the equipment they were operating, 29 C.F.R. § 1928.57(a)(6)(v), and to ensure that all employees were clear before engaging power on the equipment, 29 C.F.R. § 1928.57(a)(6)(iv). Although Sebright's experts acknowledge that Sebright foresaw the possibility of someone entering the extruder to perform maintenance, they indicated that lockout/tagout procedures provided the primary safeguard in this situation and that violating the OSHA regulations would be unreasonably dangerous. In addition to relying on lockout/tagout procedures, Sebright equipped the extruder with a safety device—a locking selector switch that included a removable key that an operator could use to turn the extruder to the "off" position and prevent the machine from inadvertently starting during maintenance. At the time of Montemayor's accident, however, the key was broken off

inside the switch, thus disabling the safety device.

After investigating Montemayor's injury, Minnesota OSHA (MNOSHA) cited and fined the employer for three separate safety violations. First, MNOSHA determined that "[a] lack of training in safe operation and servicing of equipment caused and contributed" to the incident. The MNOSHA report indicated that "[e]mployees were not instructed by management on how to clear a jam" in the extruder, "resulting in a serious injury to the employee." Second, MNOSHA determined that the "extruder was not locked out prior to" the employees' attempts to clear the jam, even though the employer had "a written Lock out program." MNOSHA also observed that "[a] lockable electrical disconnect was located on the extruder." According to the report, "if lock out was utilized the machine would have not been able to cycle, thus not seriously injuring" Montemayor. Finally, MNOSHA determined that the operator did not "verify all employees were clear of the machine" before restarting the extruder. Accordingly, MNOSHA cited the employer for "serious" violations of 29 C.F.R. § 1928.57(a)(6), 29 C.F.R. § 1928.57(a)(6)(v), and 29 C.F.R. § 1928.57(a)(6)(iv).

In examining foreseeability, we must determine whether Sebright reasonably should have anticipated the employer's OSHA violations and other safety lapses. Our leading case addressing the foreseeability of OSHA violations is *Huber v. Niagara Machine & Tool Works*, 430 N.W.2d 465 (Minn. 1988). In *Huber*, we held that it was not reasonably foreseeable to the manufacturer of a foot-switch mechanism that an employer would fail to comply with OSHA regulations addressing "point of operation safety mechanisms" for a punch press. *Id.* at 468. As a result, we

held that the manufacturer had "no duty to insure the use of such safety devices" and "no duty to warn about possible dangers of failing to provide proper point of operation safety mechanisms." *Id.* Applying the analysis from *Huber,* I conclude that Sebright had no duty as a matter of law in this case because it was not reasonably foreseeable that VZ Hogs would fail to comply with OSHA regulations covering the safe operation of the extruder. In fact, the circumstances of this case are even more compelling than *Huber* because Montemayor's employer committed three separate OSHA violations relating to basic safety procedures.[2]

The majority, however, relies on a prior case, *Bilotta v. Kelley Co.,* 346 N.W.2d 616 (Minn. 1984), in reaching the conclusion that the OSHA violations do not negate Sebright's liability. But that case is inapposite. In *Bilotta,* we concluded that OSHA violations did not preclude recovery in a products liability action against a manufacturer where the manufacturer's own quality control manager had written "an article for an industrial magazine which stated that, because of high employee turnover, it was 'difficult to assure that necessary safety education is being accumulated and retained.'" *Id.* at 625. "[I]n these circumstances," we concluded that the OSHA violations were reasonably foreseeable. *Id.* In this case, Montemayor does not point to *any* evidence that Sebright was aware or should have been aware that employers like VZ Hogs were ignoring basic safety regulations. The record contains no such evidence because VZ Hogs, in fact, had a written safety pro-gram, which required employees to "have complete instructions" before operating a machine, to "block the machine" before clearing a jam, and to "[m]ake sure that everything and everyone are clear of the machine prior to restarting after a jam or breakdown." In short, *Bilotta* does not support the result the majority desires.

The majority also relies heavily on our decision in *Parks v. Allis-Chalmers Corp.,* 289 N.W.2d 456 (Minn. 1979), to support the conclusion that injuries resulting from workers entering power-connected machines may be reasonably foreseeable. Although the majority suggests that *Parks* involves "strikingly similar" facts, that case is also readily distinguishable. In *Parks,* the plaintiff presented evidence that it was easier and faster for employees to unclog the machine while it was running. *Id.* at 458. Based on that evidence, we concluded that "[t]he jury could find that defendant knew, or in the exercise of reasonable care should have known, that some users would leave the power connected while unclogging because that would furnish mechanical assistance, saving time and effort." *Id.* at 459. In contrast to the evidence presented in *Parks,* the district court in this case found that "Montemayor has not offered any facts to suggest there is any reason, purpose, or utility to keep power sources connected to the machine" while clearing materials from the machine by hand.

*Parks* is further distinguishable because we observed that the machine in that case "was not equipped with a safety interlock device." 289 N.W.2d at 459. In this case,

---

**2.** The majority suggests that *Huber* is not relevant because we were addressing the duty of a component manufacturer. This is a distinction without a difference. In *Huber,* we articulated and applied "the standard for determining whether a manufacturer has a duty to warn." 430 N.W.2d at 467 (citing *Germann,*

395 N.W.2d at 924). This is the same standard articulated by the majority in this case: whether the connection between the danger and the alleged negligent act "is too remote to impose liability as a matter of public policy." *Germann,* 395 N.W.2d at 924.

Sebright equipped the extruder with the safety device—the locking selector switch—that was lacking in *Parks*. The fact that this device was disabled because the key was broken off in the switch cannot be attributed to Sebright. We have previously rejected the argument that a manufacturer has a duty to "warn against a danger that may exist if the safety features provided are broken or not maintained by the user." *Westerberg v. Sch. Dist. No. 792*, 276 Minn. 1, 148 N.W.2d 312, 315 (1967). Although the majority indicates that an employer can be liable for an injury despite "the disabling of safety devices if such circumstances were also foreseeable," *see Germann*, 395 N.W.2d at 925, there is no evidence in the record that the disabling of the locking selector switch on the Sebright extruder was foreseeable. In fact, Montemayor's expert did not even acknowledge the existence of the locking selector switch in his reports. Further, the majority discounts the significance of the disabling of the locking selector switch, speculating that if the locking selector switch had been functional, the supervisor who typically held the key may have given it to the person that he directed to unjam the extruder. There is no need to speculate, however, because that supervisor specifically testified, "[H]ad that key not been broke off in that box, that key would have been in my pocket. This [incident] wouldn't have happened." The *evidence* on this point could not be more clear.

Despite the supervisor's clear testimony, evidence that he repeated no less than three times, the majority nevertheless determines that "a reasonable person could find that [the supervisor] would have given the key" to another person, and therefore summary judgment should have been denied. The majority identifies no actual evidence from which the so-called "reasonable person" could draw such a conclusion, because there is none. And under our summary judgment standard, appellate courts do not get to make up evidence or speculate in order to create an issue for trial. *See DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997) (stating that a genuine issue of material fact for trial must be established through "substantial evidence"—not merely by showing "some metaphysical doubt" (citations omitted) (internal quotation marks omitted)).

In sum, our precedent compels an affirmance.

## II.

Not content with the result our precedent compels, and notwithstanding the lack of any evidence that would support the conclusion that Sebright should have reasonably anticipated the multiple employer failures that led to Montemayor's injury, the majority manufactures an issue for trial based on what it labels as "expert reports." [3] Specifically, the majority relies on these expert reports to conclude that this case presents a factual dispute on the issue of foreseeability that the jury must decide. But these reports do not create a factual dispute because Montemayor's expert simply makes conclusory statements that Sebright should have foreseen the employer's failure to train its employees, the failure to neutralize the power to the extruder while clearing the jam, and the failure to ensure that employees were clear of the machine. It is "well settled" that an expert must rely on facts that are "supported by the evidence"—not "specu-

---

**3.** To be clear, these reports are letters written to Montemayor's lawyer from an expert the lawyer retained. As discussed below, these letters are likely inadmissible and, even assuming they are admissible, the reports are plainly not sufficient to create an issue for trial.

lation or conjecture"—in order to create an issue for trial. *Gianotti v. Indep. Sch. Dist. 152*, 889 N.W.2d 796, 802 (Minn. 2017); *see also Fed. Ins. Co. v. Pratt's Express*, 308 Minn. 282, 241 N.W.2d 488, 489 (1976) (explaining that a conclusion "without evidentiary support was not sufficient to raise a justiciable issue" on summary judgment).

In this case, Montemayor's expert does not rely on facts with evidentiary support, as our precedent requires; the expert instead rested his opinion on conjecture and speculation. The majority does not demonstrate otherwise and the record here does not leave room for any other conclusion. For example, the expert does not dispute that the employer's failure to properly train Montemayor in "the proper and safe use of the machine," failure to use OSHA-required safety procedures such as lockout/tagout procedures, and failure to properly supervise Montemayor were "root causes" of the injury. Nonetheless, the expert concludes, without any support or explanation, that these "short-comings" should have been "reasonably foreseeable" to Sebright. The closest that Montemayor's expert comes to providing a basis for his opinions is his statement that if Sebright had performed a hazard analysis or safety testing, it would have been foreseeable that untrained employees would be cleaning out the extruder and would restart the extruder from a remote location without performing lockout/tagout procedures. Montemayor's expert further speculates that "[i]f a hazard analysis had been performed, it is reasonably foreseeable that the method used by Mr. Montemayor to remove the material in the machine would have been identified."

As an initial matter, the only evidence in the record demonstrates that the underlying assumptions of the expert's opinions are wrong. Although Montemayor's expert asserts that Sebright never performed any safety testing and that Sebright "did not have a system for documenting customer feedback," Sebright's expert points to specific testimony in the record confirming numerous operational evaluations of the extruder, as well as specific testimony that Sebright worked closely with customers to obtain feedback that was incorporated into future units. In opposing summary judgment, the nonmoving party may not rest upon "mere averments or denials ... but must present specific facts showing that there is a genuine issue for trial." Minn. R. Civ. P. 56.05.[4]

Further, Montemayor's expert merely speculates that the incident here would have been reasonably foreseeable had Sebright performed a hazard analysis or safety testing. Our case law is clear that "general assertions" and speculation "are not sufficient to create a genuine issue of

4. In providing other "bases" for his opinion, Montemayor's expert gets other facts wrong as well. For example, Montemayor's expert indicates that the failure to have the operating manual for the extruder "readily available at the machine" was "one of the root causes for this incident." The evidence simply does not support this conclusion. In fact, a VZ Hogs employee specifically testified that the manual was located in "a big stainless steel box" that "stayed right with the machine." In addition, the majority relies on the expert's conclusion that Sebright failed to comply with American National Standards Institute (ANSI) standards for safety features as one of the circumstances that creates a fact dispute here, but the ANSI standards cited by Montemayor's expert are the ANSI standards for *conveyors* and *compactors*. The expert did not cite any applicable standard for high density extruders like the Sebright extruder, and he did not attempt to rebut the statement of Sebright's expert that "[n]o such time delay and alarm system was required by any applicable standard for the high density extruder and no such start up time delay and alarm system was incorporated on any of the competitors['] extruders."

material fact for trial." *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995); *see also Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993) ("Mere speculation, without some concrete evidence, is not enough to avoid summary judgment."). Moreover, there is no evidence in the record that anyone anywhere had ever attempted to climb into the discharge chute of the extruder to clear a jam. Other VZ Hogs employees testified that they never would have foreseen that someone would climb into the discharge chute, and the MNOSHA report specifically stated that "the extruder should never have to be physically entered" to clear a jam.[5]

In addition, even though foreseeability is "a threshold issue related to duty that is ordinarily 'properly decided by the court,'" *Domagala v. Rolland*, 805 N.W.2d 14, 27 (Minn. 2011) (quoting *Alholm v. Wilt*, 394 N.W.2d 488, 491 n.5 (Minn. 1986)), the majority relies on the conclusory assertions of Montemayor's expert that the employer's safety lapses were reasonably foreseeable to conclude that there is a "factual dispute regarding foreseeability" that "the jury must decide." But "an expert opinion must be more than a conclusory assertion" about the ultimate legal issue in order to defeat a motion for summary judgment. *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)

(refusing to "allow the reliance on a bare ultimate expert conclusion to become a free pass to trial"); *see Patton v. Newmar Corp.*, 538 N.W.2d 116, 120 (Minn. 1995) (holding that an expert affidavit that "contains no specific factual support" but only "bare conclusions" is "legally insufficient to oppose summary judgment"); *Conover v. N. States Power Co.*, 313 N.W.2d 397, 403 (Minn. 1981) (making a distinction "between opinions as to factual matters, and opinions involving a legal analysis or mixed questions of law and fact" (citation omitted) (internal quotation marks omitted)). Therefore, the bare conclusions of Montemayor's expert cannot sustain the claim here and, consistent with our precedent, these conclusions do not create an issue for trial. To be clear, the result the majority reaches here means that in order to defeat summary judgment in a products liability case, all a plaintiff needs to do is hire an expert who will sign a letter speculating—without any evidentiary support—that the manufacturer must have known that this type of accident would occur. That has never been the law in Minnesota, and I cannot subscribe to such a rule of law.

Indeed, the majority's decision that a jury must decide the issue of foreseeability rests on letters from an expert to the attorney who hired him—inadmissible hearsay—that is not even properly consid-

---

5. The majority relies on several of these unsupported and speculative statements to conclude that this case is similar to other foreseeability cases. For example, the majority cites a nonprecedential Eighth Circuit decision, *Bursch v. Beardsley & Piper*, 971 F.2d 108 (8th Cir. 1992), to conclude that an injury sustained when a worker enters a power-connected machine is foreseeable. But that case involved vastly different evidence than the evidence presented by Montemayor, not to mention a different procedural posture. In *Bursch*, after reviewing the evidence from trial, the Eighth Circuit determined that the negligent training of operators was foresee-

able where the manufacturer's "own expert admitted that it was common practice in the industry to have existing operators train new ones" and there was evidence that operators of the machine may not have read the operating manual. 971 F.2d at 112. In this case, Montemayor's expert simply states summarily, without any factual or evidentiary support, that it was reasonably foreseeable that the employer would fail to properly train employees in the proper and safe use of the extruder. Any similarities between this case and the facts in *Bursch* are based on unsupported inferences that cannot be made on this record.

ered on summary judgment. *See* Minn. R. Civ. P. 56.05 (requiring that affidavits supporting and opposing summary judgment "shall set forth such facts as would be admissible in evidence"); Minn. R. Evid. 803(6) (excluding from the definition of admissible business records "[a] memorandum, report, record, or data compilation prepared for litigation"). Although Sebright did not object to these reports, it is noteworthy that the majority relies on expert reports that neither the district court nor the court of appeals even mentioned in their decisions. And this would be the first time our court has found fact disputes that

preclude summary judgment based only on unsworn expert reports—indeed, letters from an expert to an attorney—not affidavits or other admissible testimony.[6]

Finally, the majority concludes that "[e]ven if there was not an explicit factual dispute in the record," the issue of foreseeability should still go to the jury because "this is a 'close case' " where " 'reasonable persons might differ' as to the foreseeability of Montemayor's injury." The majority misstates our summary judgment standard.[7] We review a grant of summary judgment to determine whether genuine issues of material fact exist and whether

---

6. To be sure, we concluded in a 1985 case that "technical defects" in the letter of a licensed consulting psychologist should not have precluded consideration of the letter on summary judgment, but we also noted that the expert was not qualified to give an opinion on the conduct at issue and that the contents of the letter added nothing to what was already in the record. *Lundgren v. Eustermann*, 370 N.W.2d 877, 881 (Minn. 1985). At the same time, we stressed that we were not "minimiz[ing] the importance of making a proper record for a summary judgment motion" and explained that "in addition to the pleadings, affidavits and depositions," the district court may consider any "material that would be admissible in evidence or otherwise usable at trial." *Id.* at 881 n.1 (citing 6 J. Moore & J. Wicker, *Federal Practice* ¶ 56.15[7] (1985)).

More recently, in *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367 (Minn. 2008), we considered an unnotarized expert report "as part of the record" because the district court had considered the expert report. *Id.* at 370 n.2. Nonetheless, we specifically declined to consider the expert report when determining whether there was a genuine issue of material fact, stating that because "the effects of alcohol are within the common knowledge of lay people," *id.* at 380, there was "no need to determine the weight, if any, that is to be given to the expert report or its admissibility at trial," *id.* at 378-79. Unlike the district court in *Osborne*, the district court in this case did not address the expert report. The failure of the district court to address an expert report that consists of inadmissible

hearsay and factual misstatements, and amounts to nothing more than speculation and conclusory assertions about the ultimate legal issue does not raise a "red flag" about the district court's analysis; rather, such gatekeeping is precisely what we expect district courts to do.

7. The majority agrees that "the 'close cases' standard does not change our summary judgment standard for questions of foreseeability," yet the majority nonetheless indicates that "a case is 'close' not only when the evidence presents an explicit dispute of material fact, but also when 'reasonable persons might draw different conclusions from the evidence,' " (quoting *Osborne*, 749 N.W.2d at 371). The majority miscasts our summary judgment standard by dividing what has until now been a single, unified test. Whether reasonable minds can draw different conclusions from the evidence is the test for determining whether a fact dispute exists: "A genuine issue of fact exists when reasonable minds can draw different conclusions from the evidence presented." *328 Barry Ave., LLC v. Nolan Props. Grp., LLC*, 871 N.W.2d 745, 751 (Minn. 2015). The reasonable-minds-drawing-different-conclusions examination is not itself a separate summary judgment standard that is distinct from whether there is a fact dispute. Our case law is clear that "[t]he district court's function on a motion for summary judgment" is "*solely* to determine whether genuine factual issues exist." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997) (emphasis added).

the district court erred in applying the law. *Ruiz v. 1st Fid. Loan Servicing, LLC*, 829 N.W.2d 53, 56 (Minn. 2013). We noted in a recent negligence case that "[o]ur case law states, without explaining, that in close cases, foreseeability as it relates to duty is a jury question." *Doe 169 v. Brandon*, 845 N.W.2d 174, 178 n.2 (Minn. 2014) (deciding foreseeability "as a matter of law"). Although we have not specifically explained what we meant about the role of the jury, it is clear that we were not creating a new summary judgment standard.

For example, in one products liability case, we indicated that "[i]n close cases, the question of foreseeability is for the jury," but we also applied our well-established summary judgment standard—that "[t]o defeat a summary judgment motion, the nonmoving party must come forward with specific facts showing that there are genuine issues for trial." *Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 917-19 (Minn. 1998) (reinstating summary judgment where "the danger" was too remote to impose a duty on the manufacturer), *cited in Domagala v. Rolland*, 805 N.W.2d 14, 27 (Minn. 2011). Our language about close cases was simply an inartful way of stating the general rule that "if any doubt exists as to the existence of a genuine issue as to a material fact, the doubt must be resolved in favor of finding that the fact issue exists." *Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 219 N.W.2d 641, 646 (1974) ("Facts, inferences, or conclusions that may be drawn by a jury are fact issues.").

Examination of *Lundgren v. Fultz*, 354 N.W.2d 25 (Minn. 1984), the first case in which we used the close-case language, makes clear that we did not intend to change our summary judgment standard even when the issue is foreseeability. In *Lundgren*, we said that "[c]lose questions on foreseeability should be given to the jury." *Id.* at 28. We provided no authority for the proposition, but relied on *Illinois Farmers Insurance Co. v. Tapemark Co.*, 273 N.W.2d 630 (Minn. 1978), as an example to illustrate the point. In *Illinois Farmers*, we reversed summary judgment not because we viewed the case to be "close." Rather, we reversed summary judgment "[b]ecause there [were] genuine disputes about facts" relevant to the issue of foreseeability. *Id.* at 638. In short, the majority errs when it alters our summary judgment standard and creates a special rule for foreseeability questions, especially because our case law is clear that the duty of a manufacturer is not a question "for jury resolution." *Germann*, 395 N.W.2d at 924 (explaining that the court must determine whether the connection between the alleged negligent act and the injury is "too remote to impose liability as a matter of public policy").

III.

Even if I were to apply the majority's new rule, the result would be the same because the question of foreseeability here is not close. Montemayor's injury occurred when an untrained employee climbed into a machine known as "the smasher" without disconnecting the power and another employee restarted the machine without ensuring that all employees were clear. Although specific, individual circumstances of this incident may have been reasonably foreseeable, in order to foresee the risk of Montemayor's injury, Sebright would have had to anticipate the failure to perform lockout/tagout procedures; the failure to comply with two other core safety regulations, including verifying that employees were clear before restarting the extruder; and the disabling of a key safety mechanism on the machine. The court of appeals accurately summarized what Sebright would have had to foresee:

Montemayor and his fellow employees failing to follow the instruction manual concerning how to clear jams and decals warning that no one should enter the extruder or enter the machine without following proper lockout/tagout procedures; VZ Hogs failing to implement and train its employees in general OSHA-required lockout/tagout procedures; Montemayor and other employees attempting to clear the jam manually; the liquid shed supervisor instructing both Montemayor and the electrical maintenance person to clear the jam; the employees failing to communicate with one another; and an employee activating the extruder's power while Montemayor was inside the machine, causing the plenum to drop on his legs.

*Montemayor*, 2016 WL 1175089, at *4.[8]

We have warned against "carrying the duty of a manufacturer too far to require it to anticipate every injury that might occur" when a machine is "improperly used." *Germann*, 395 N.W.2d at 925. As the district court concluded, to hold that Sebright had a duty to Montemayor under the facts of this case would set such a low threshold for duty that it is "potentially no threshold at all." The majority essentially imposes a duty on manufacturers to design an "acci-

dent-proof or fool-proof" product. *Larsen v. Gen. Motors Corp.*, 391 F.2d 495, 502 (8th Cir. 1968). Because the connection between Montemayor's injury and Sebright's alleged negligence is too remote to impose liability, I respectfully dissent.

ANDERSON, Justice (dissenting).

I join in the dissent of Chief Justice Gildea.

STRAS, Justice (dissenting).

I join in the dissent of Chief Justice Gildea.

---

**8.** The majority indicates that the district court erred by failing to consider the possibility that "a reasonable person could find that Sebright should have foreseen the possibility of a worker operating the extruder from the control panel without the ability to observe another worker performing maintenance inside the machine." To begin with, there is no evidence that it was reasonably foreseeable to Sebright that the employer would relocate the control panel to a remote location, particularly where the employer chose to relocate the control panel to a different room after a Sebright employee personally visited the VZ Hogs worksite to oversee the proper installation of the extruder and where the manual specifically instructed operators to be certain that "no one is inside the equipment" or near "any

point of operation" before operating the equipment. *Cf. Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984) (stating in a defective-design case that the plaintiff must establish that the defect "existed when the product left the defendant's control"). Further, Montemayor was not performing maintenance; he was trying to clear a jam. As noted, the MNOSHA report specifically determined that "the extruder should never have to be physically entered" to clear a jam. Moreover, the VZ Hogs employee operating the extruder from the control panel at the time of Montemayor's accident admitted that he could see Montemayor's co-worker standing inside the compactor next to the discharge chute in an unsafe position, yet still activated the extruder.