LILLEHAUG, Justice.
*198 A 16-year-old high-school student caused a fatal accident while driving his cross-country teammates and a volunteer coach to an extracurricular athletic competition in Sioux Falls, South Dakota. Gary Fenrich was killed and his wife, appellant JeanAnn Fenrich, was severely injured. She brought a negligence action against respondent The Blake School ("the school"). The district court granted the school's motion for summary judgment, concluding that, as a matter of law, the school did not owe a duty of care to members of the general public. The court of appeals affirmed, but on a different ground, holding that the school's conduct did not create a foreseeable risk of injury to a foreseeable plaintiff. Because summary judgment was not proper in the circumstances of this case, we reverse the court of appeals.
FACTS
On November 12, 2011, shortly before 11:00 a.m., Gary Fenrich was driving northbound on Minnesota Highway 15 in Watonwan County. His wife, JeanAnn Fenrich, was in the front seat on the passenger side. An oncoming car crossed over the centerline and collided with the Fenrichs. Gary was killed and JeanAnn suffered serious injuries.
The car that crossed the centerline was driven by T.M., a 16-year-old boy. T.M. was a member of the school's cross-country team. He was driving himself, two other members of the team, and the team's volunteer coach as part of a team trip to Sioux Falls.
The team had participated in the interscholastic Minnesota State High School League ("the League") season, which had just ended. But T.M. and his teammates were going to the Nike Cross Nationals Heartland Regional meet in Sioux Falls. The Nike meet was not a League-sponsored event and, because it occurred after the League's official season had ended, the team's coaches were not allowed to help prepare the team for it. Nevertheless, both the head coach and the assistant coach assisted the team as the Nike meet approached.
The Nike meet was listed on the team's official schedule, which was posted on the team website.[1] At least four posts were made on the website referencing the upcoming Nike meet. For example, during the League season, the head coach sent an email to the team members and parents stating: "Sunday, November 13th, the Nike Heartland Regional meet in Sioux Falls. All varsity and top JV runners encouraged to participate. Talk to [the assistant coach] for details."
Team members were instructed to tell the coaches in writing if they were planning to attend the Nike meet. Fourteen members of the team signed up, and the assistant coach paid the team's $300 bulk meet-participation fee.
Because the official League season had ended, and in an effort to comply with League rules, the assistant coach arranged *199 for a volunteer coach-a recent graduate of the school-to run practices the week before the Nike meet. The assistant coach emailed the team: "All practices are run by Captains, (and [the volunteer coach] ) this week."
Although the team members were nominally responsible for arranging their own lodging and transportation to the Nike meet, the team's coaches helped coordinate the arrangements. On November 7, the assistant coach sent out the following email to a team parent:
I am stopping by the school before practice to make sure everyone has coordinated rides and rooms for this weekend. If [your son] gets a chance, it would be nice if he could get [in] an easy run before dinner.
We are very excited with the number of runners that signed up for the meet (officially completed as well, as I submitted/paid early this morning). This will be a lot of fun and a great way to end the sea[s]on.
Two days later, the coaches received an email from T.M.'s mother that read, in relevant part:
[T.M.], his dad and I just finished a conversation about transportation for the race this weekend. It sounds like [T.M.] (and the boys) would like to have a caravan down and back with you. We are very comfortable with [T.M.'s] driving skills and he's legal now to have passengers, and we are fine with him taking our car. Given the long distance though, we would like to know that he is following you, and won't be venturing to Sioux Falls and back without an adult at least in [the] rear view mirro[r]s. All we would need is you to confirm that is the plan .... Please know that [T.M.'s father] is willing to drive as well, if you would prefer that, but we understand also that 'Coach plus kids' sounds like a more fun venture for [T.M.] and the boy team runners ....
The assistant coach called the head coach to ask whether he was comfortable with T.M. driving. The head coach replied that he did not get involved with those decisions. The assistant coach then replied to the email stating: "That works, we will drive in a caravan at a safe speed!"
On the morning of November 12, the students met at the assistant coach's house in Chanhassen for the two-car "caravan" to Sioux Falls. The assistant coach estimated that they would be on the road for about five hours. The majority of the team rode with the assistant coach, including the assistant coach's own son.
Three people rode with T.M.: two students and the volunteer coach, who was located in the back seat behind T.M. Although T.M.'s mother stated that T.M. could legally drive multiple passengers, this assertion is not supported by the record. T.M. obtained his driver's license on June 17, 2011, and all three of his passengers, including the volunteer coach, were under the age of 20. See Minn. Stat. § 171.055, subd. 2(c) (2016) ("For the first six months of provisional licensure, a provisional license holder may not operate a motor vehicle carrying more than one passenger under the age of 20 years who is not a member of the holder's immediate family.").
Before departing, the assistant coach gave no driving instructions to either T.M. or the volunteer coach. Nor did the volunteer coach give T.M. any instructions.
T.M. followed the assistant coach's car. During a brief stop outside of Mankato, the assistant coach reminded T.M. to "make sure we keep it safe and keep rolling." He provided no specific instructions as to how "we keep it safe." Thereafter, *200 the vehicles turned southbound onto Highway 15, a two-lane highway.
As the vehicles approached Lewisville, in Watonwan County, the volunteer coach was in the back seat using his phone. According to the volunteer coach, T.M. was probably distracted by his own phone.[2] As a result, T.M. swerved over the centerline of the highway, into oncoming traffic, and his car collided with the Fenrichs' vehicle. JeanAnn was severely injured, and Gary was killed.
After the accident, police interviewed the assistant coach and the volunteer coach. The volunteer coach described himself as "an assistant coach with the Blake Cross Country Team" and told police that "we all drove down as a team." The assistant coach told police that he had already talked to the school and told them that any future trips would need to be by bus. He also said: "[W]hy would [T.M.] even be driving that far .... I don't know why I didn't just say ... what are we doing with a 16 year old driving this distance?"
In November 2014, Fenrich, in her individual capacity and as her husband's trustee, brought an action in Watonwan County against the school, the head coach, the assistant coach, and the volunteer coach. She pleaded claims of wrongful death, negligence, and negligence per se against all defendants, and also asserted negligent supervision and vicarious liability claims against the school.
In April 2015, the district court dismissed Fenrich's claim of negligence per se. The court also dismissed all claims against the head coach and assistant coach, concluding that the applicable statute of limitations had expired.
In May 2016, the school and the volunteer coach each moved for summary judgment, arguing that they owed no legal duty to members of the general public and that T.M. was not acting as an agent of the school or the volunteer coach. In August 2016, the district court denied the motion because (1) "a reasonable person [could] draw a conclusion that The Blake School assumed control and supervision over the cross country team's transportation to and from and participation in the Nike Meet," and (2) there were sufficient facts "for a reasonable person to find that [T.M.] was acting as an agent of the school and/or [the volunteer coach]."
In October 2016, the district court issued an order dismissing Fenrich's claims of negligence and negligent supervision, concluding that, although the school may have owed a duty to its students, neither the school nor its volunteer coach owed any duty of care to non-student third parties such as Fenrich. The court observed that Fenrich's only remaining claim was for wrongful death on a vicarious liability theory.
In November 2016, following the school's request for reconsideration, the district court dismissed the volunteer coach from the lawsuit because no direct claims remained against him. The district court also dismissed Fenrich's vicarious liability claim because a June 2014 settlement agreement between Fenrich and T.M.'s family (and insurers) released T.M., T.M.'s father, and their principals from all claims. With no claims remaining, final judgment was entered.
Fenrich appealed, arguing that the district court erred by determining as a matter of law that the school owed no duty of care. The court of appeals affirmed the district court's grant of summary judgment, but on different grounds. The court *201 first concluded that "a school may have a duty of reasonable care to prevent harm caused by a student who drives a private vehicle in connection with a school-sponsored extra-curricular activity," and that the evidence, taken in the light most favorable to Fenrich, "is capable of proving that the school assumed control and supervision over [the team's] transportation to and from the Nike meet and, thus, is capable of proving that this is a case of misfeasance." Fenrich v. Blake School , 901 N.W.2d 223, 230-31 (Minn. App. 2017).
Having concluded that a school may "have a duty to protect the general public from injury caused by a student," the court then considered whether "the risk of a collision between T.M.'s vehicle and the Fenrichs' vehicle was foreseeable." Id. at 232. The court concluded that, as a matter of law, "the summary-judgment record does not contain evidence that is capable of proving that the probability that T.M. would cause an automobile accident was high enough to make [it] foreseeable." Id. at 232-33. Accordingly, the court held that "[t]he district court did not err by granting the school's motion for summary judgment with respect to Fenrich's claim that the school was negligent." Id. at 234.
We granted Fenrich's petition for review.
ANALYSIS
Fenrich appeals from an order granting summary judgment in favor of the school on her claim of negligence. Summary judgment is only appropriate when "there is no genuine issue as to any material fact and [a] party is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.01. We review a grant of summary judgment de novo to determine "whether there are any genuine issues of material fact and whether the court erred in its application of the law to the facts." Commerce Bank v. W. Bend Mut. Ins. Co. , 870 N.W.2d 770, 773 (Minn. 2015). In conducting this review, "we view the evidence in the light most favorable to the nonmoving party ... and resolve all doubts and factual inferences against the moving parties." Rochester City Lines, Co. v. City of Rochester , 868 N.W.2d 655, 661 (Minn. 2015). As we have emphasized recently, summary judgment on the issue of duty is " 'inappropriate when reasonable persons might draw different conclusions from the evidence presented.' " Montemayor v. Sebright Prods., Inc. , 898 N.W.2d 623, 628 (Minn. 2017) (quoting Osborne v. Twin Town Bowl, Inc. , 749 N.W.2d 367, 371 (Minn. 2008) ); see also Senogles v. Carlson , 902 N.W.2d 38, 42 (Minn. 2017).
I.
This case involves a claim of negligence. "Negligence is the failure to exercise the level of care that a person of ordinary prudence would exercise under the same or similar circumstances." Doe 169 v. Brandon , 845 N.W.2d 174, 177 (Minn. 2014) (citation omitted). "A defendant in a negligence action is entitled to summary judgment when the record reflects a complete lack of proof on any of the four elements necessary for recovery: (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of that duty being the proximate cause of the injury." Louis v. Louis , 636 N.W.2d 314, 318 (Minn. 2001). This case turns on the first element of a negligence claim: the existence of a duty of care.
As a general rule, "a person does not owe a duty of care to another ... if the harm is caused by a third party's conduct." Doe 169 , 845 N.W.2d at 177-78. There are two exceptions to this rule. The first is "when there is a special relationship between a plaintiff and a defendant and the *202 harm to the plaintiff is foreseeable." Id. at 178. The second is when "the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." Domagala v. Rolland , 805 N.W.2d 14, 23 (Minn. 2011). If either the "special relationship" or the "own conduct" exception applies, a negligent defendant may be held liable to a plaintiff for harm caused by a third party.
In this case, the district court granted summary judgment for the school because it concluded, as a matter of law, that the school owed only a duty of care to its students, not to the general public. The court of appeals disagreed, but affirmed the grant of summary judgment because it concluded that there was not a foreseeable risk of injury to a foreseeable plaintiff. Fenrich , 901 N.W.2d at 234. These decisions require that we consider what duty, if any, a school has to the general public.
At the threshold, the school urges us to adopt a categorical rule that, as a matter of law, a school never owes a duty of care to non-student third parties for injuries resulting from student conduct. We recognize the obvious-schools are important for our civilized society-but, having no precedent that creates this exception, we see no good reason to carve out schools from basic principles of tort law. Like any other Minnesota person or entity, a school does not owe a duty of care to the general public if the harm is caused by a third party's conduct. But this rule is subject to two exceptions: (1) if there is a special relationship between the plaintiff and the school and the harm to the plaintiff is foreseeable; or (2) if the school's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff. See Doe 169 , 845 N.W.2d at 178.
In arguing for a categorical exception, the school directs us to Gylten v. Swalboski , 246 F.3d 1139 (8th Cir.2001). In that case, the Eighth Circuit was asked to decide whether, applying Minnesota law, a school could be held liable for negligently failing to supervise a student who, while driving to football practice, caused a car accident that injured the non-student plaintiff. Id. at 1141-42. In holding that the school did not owe a duty of care, the court considered only whether there was a special relationship between the school and the general public giving rise to a duty of care. Id. at 1143. The court did not address the "own conduct" exception, much less create for schools a categorical exclusion from tort liability. Gylten is not persuasive authority here.[3]
II.
Having declined to create a categorical exclusion from liability for schools, we next consider whether there was a "special relationship" between the school and the general public on these facts. Fenrich argues that a special relationship existed between the Fenrichs and the school under in-loco-parentis and common-carrier theories. Neither theory, however, fits the facts.
In loco parentis "refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption ...." London Guarantee & Acc. Co. v. Smith , 242 Minn. 211, 64 N.W.2d 781, 784 (1954). We have never held that a school generally stands *203 in loco parentis with its students, and we will not do so today. Cf. Hollingsworth v. State , No. A14-1874, 2015 WL 4877725, at *4 (Minn. App. Aug. 17, 2015) ("Hollingsworth concedes that schools generally do not owe a duty of care in loco parentis to protect students."). Moreover, in this case, the school did not generally assume "the obligations incident to the parental relation." Smith , 64 N.W.2d at 784.
Alternatively, Fenrich argues that a special relationship existed because T.M.'s vehicle was a "school bus," thus triggering a duty of care between the school and the Fenrichs under a common-carrier theory. This argument is meritless. The statutory definition of "school bus" does not include the type of vehicle that T.M. was driving. See Minn. Stat. § 169.011, subd. 71(a) (2016) (defining "school bus" by excluding "a vehicle ... qualifying as a type III vehicle under paragraph (h)"); id. , subd. 71(h) (defining "type III vehicle" as "passenger cars ... having a maximum manufacturer's rated seating capacity of ten or few people, including the driver, and a gross vehicle weight rating of 10,000 pounds or less").
III.
There being no special relationship, we next analyze the "own conduct" exception. Doe 169, 845 N.W.2d at 178 ; Domagala , 805 N.W.2d at 23. We consider whether: (1) the school's own conduct, (2) created a foreseeable risk, (3) to a foreseeable plaintiff.
A.
We start with the phrase "own conduct." In analyzing a defendant's "own conduct," we have drawn a distinction between misfeasance and nonfeasance. Misfeasance is "active misconduct working positive injury to others." Doe 169 , 845 N.W.2d at 178 (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 56 (5th ed. 1984) ). Nonfeasance is "passive inaction or a failure to take steps to protect [others] from harm." Id. (alteration in original); see also Restatement (Second) of Torts § 314 cmt. c (Am. Law Inst. 1965) (discussing the origins of the distinction between misfeasance and nonfeasance). If a defendant's conduct is mere nonfeasance, that defendant owes no duty of care to the plaintiff for harm caused by a third party. Doe 169 , 845 N.W.2d at 178.
We cannot conclude, as a matter of law, that the school's conduct was mere nonfeasance. Instead, viewing all of the evidence, and the reasonable inferences from it, in favor of Fenrich, we agree with the district court and the court of appeals that the school went beyond passive inaction by assuming supervision and control over its athletic team's trip to Sioux Falls.
Our decision in Verhel ex rel. Verhel v. Independent School District No. 709 , 359 N.W.2d 579 (Minn. 1984), is highly instructive. In Verhel , members of the high school cheerleading team spent the night "decorating with posters the homes of the football players for the opening game." Id. at 584. Early in the morning the cheerleaders were involved in a car accident. Id. at 583. An injured cheerleader sued the cheerleader-driver and the high school, arguing that the high school negligently supervised the driver. Id. We framed the issue of duty as whether the school district exercised or assumed "supervision and control over [the] student organization and its activities by appropriate agents of the school district." Id. at 586. We concluded that the school district had assumed control and supervision over the cheerleading team. Id. at 587. In reaching this conclusion, we found it significant that (1) cheerleading was an organization "approved by the school," (2) "[t]he cheerleaders were governed by the ... [League] rules," (3)
*204 "[t]he school provided a paid supervisor for the squad, and supervising transportation arrangements was a part of the supervisory function," (4) the cheerleading squad held practices in the summer, (5) over the summer the team's faculty supervisor "kept in contact with the squad through the team captains .... visited some of the practice sessions .... [and] signed purchase orders," and (6) "[s]everal cheerleaders testified that they considered their participation in the bannering mandatory." Id. at 587-88. Given these facts, we concluded that "it is not unreasonable to hold that the school district's responsibility continued in the summer." Id. at 588.
It followed, we said, that the school "had a duty to supervise, by the exercise of reasonable care, the planning and conduct of the bannering activity of the cheerleaders" and "a duty to instruct properly and adequately the supervisor it assigned to the cheerleading squad." Id. at 589. The instructions given to the supervisor were insufficient because they "were general and nonspecific" and the supervisor "was relatively young and inexperienced." Id.
The facts that created a duty in Verhel are strikingly similar to those of this case, and, viewed in a light most favorable to Fenrich, a reasonable fact-finder could find that they constitute misfeasance. Here, the school assumed responsibility over the activity of the team members. The head coach strongly encouraged the entire team to participate in the Nike meet and 14 team members registered. The assistant coach paid the bulk registration fee. The coaches were active in preparation for the meet, including the assistant coach attending one of the practices and recruiting a volunteer coach to run them.
The assistant coach also took active responsibility for coordinating transportation to, and lodging at, the Nike meet. As he put it, "we all drove down as a team." He expressly approved the plan to have T.M.-and not T.M.'s father or another adult-drive team members and the volunteer coach more than 200 miles to Sioux Falls. The assistant coach decided that the volunteer coach, a teenager, would ride with T.M. But he did not give the volunteer coach any safety instructions-such as to sit in the front seat, to pay attention (rather than be distracted by electronic devices), and to make sure that T.M. drove responsibly. Nor did the assistant coach give any instructions to T.M., except, during a break, to "keep it safe and keep rolling." Based on these facts, a reasonable factfinder could conclude that the school's own conduct was misfeasant.
The school, though, asserts that the assistant coach was acting solely in his capacity as a parent, and not as an agent-a coach-of the school. This assertion merely creates an issue of fact. On the one hand, League rules barred the assistant coach from acting in his coaching capacity in the lead-up to the Nike meet, and on at least one occasion he expressly told a team parent that he (and the head coach) were not involved in preparing the team for the meet. On the other hand, there are facts and reasonable inferences suggesting that he was acting as a coach. Among other things, he posted on the team website that the Nike meet would be "a great way to end the season"; he paid the registration fee for the team; he expressly agreed that T.M. would drive other students; and he told police that he had talked to the school about providing safer transportation to future team events. These facts suggest that the assistant coach was acting on behalf of the school in connection with the team's trip to Sioux Falls.
The dissent attempts to distinguish Verhel on the ground that the victim was a student, and the Fenrichs were not students. But a fair reading of Verhel shows *205 that the school's duty was based on conduct that created a foreseeable risk of injury to a foreseeable plaintiff, not on the status of the victim. As we said in Verhel :
Such [driving] behavior, or misbehavior, by unsupervised students is to be expected and is precisely the harm to be guarded against by the exercise of the school district's supervision. We cannot hold, as a matter of law, that the conduct of these unsupervised students or the accident as it occurred was not reasonably foreseeable nor that the school district's negligent failure to supervise was not the proximate cause of Verhel's injury. We conclude ... that, at best, these issues are for the finder of fact.
359 N.W.2d at 590. To cabin Verhel to student plaintiffs would exempt schools from liability for injuries to foreseeable victims, a form of tort immunity not granted to other organizations.
Viewing the evidence in the light most favorable to Fenrich, we agree with the court of appeals that Fenrich "is capable of proving that this is a case of misfeasance."[4]
B.
We now turn to the question of foreseeability: whether the school's own conduct created a foreseeable risk to a foreseeable plaintiff. See Doe 169 , 845 N.W.2d at 178. "Foreseeability in the context of duty is an issue that is ordinarily reviewed de novo." Id. The school argues, and the court of appeals held as a matter of law, that the risk of T.M. crashing into the Fenrichs' vehicle was not foreseeable. We disagree.
"When determining whether a danger is foreseeable, we 'look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility.' " Foss v. Kincade , 766 N.W.2d 317, 322 (Minn. 2009) (quoting Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A. , 582 N.W.2d 916, 918 (Minn. 1998) ). "In close cases, the issue of foreseeability should be submitted to the jury." Domagala , 805 N.W.2d at 27 ; see also Senogles , 902 N.W.2d at 48 ; Montemayor , 898 N.W.2d at 629 ; Bjerke v. Johnson , 742 N.W.2d 660, 667-68 (Minn. 2007).
In deciding whether summary judgment should have been granted on the issue of foreseeability, again, we must view all of the evidence and the reasonable inferences from it in favor of the non-moving party, Fenrich. When we apply that standard, we conclude that, in the circumstances of this case, whether T.M.'s driving created an objectively reasonable expectation of danger to the public is at least a "close call," and thus summary judgment was improper. See Senogles , 902 N.W.2d at 48 ; Montemayor , 898 N.W.2d at 633.
On the one hand, T.M.'s parents told the assistant coach that they were comfortable with T.M. driving. T.M. was licensed, and there is no evidence in the record that T.M. had a history of reckless or negligent driving. T.M. was following the assistant coach's vehicle, and the accident occurred during the day. Unlike Verhel , where the students had been driving all night, no evidence suggests that T.M. was tired. 359 N.W.2d at 590.
*206 On the other hand, T.M. was not an adult, but was a teenager (age 16), who had been licensed for less than 6 months. He was driving a lengthy distance with no adults-only other teenagers-in the car. He could not legally drive multiple passengers who were under the age of 20. In preparation for the drive, the assistant coach provided no instructions to T.M., except, shortly before the accident, to "keep it safe and keep rolling." The assistant coach did tell the volunteer coach, another teenager, to ride in the car with T.M., but gave no specific instructions to the volunteer coach to monitor T.M.'s driving, or to ensure that T.M. did not become distracted while driving. Nor did the assistant coach tell the volunteer coach to sit in the front passenger seat, where T.M.'s driving could have been better supervised.
Without adult supervision in the car, the record suggests that T.M. became distracted by an electronic device while driving, and that distraction caused the fatal accident. The record also shows that the volunteer coach himself may have been distracted by an electronic device. A reasonable factfinder could conclude that, under these circumstances, it was foreseeable that a teenage driver on a long trip, in a car with three other teenagers, could get distracted and collide with another driver. See Bjerke , 742 N.W.2d at 667 ("It is not necessary that a defendant have notice of the exact method in which injury will occur 'if the possibility of an accident was clear to the person of ordinary prudence.' " (quoting Connolly v. Nicollet Hotel , 254 Minn. 373, 95 N.W.2d 657, 664 (1959) ) ). Indeed, the assistant coach said as much when, in a statement to police after the crash, he asked, "what are we doing with a 16 year old driving this distance?"
The possibility that teen drivers may be distracted by other teens and electronics is not in any way remote or attenuated. Cf. Doe 169 , 845 N.W.2d at 178-79. Other courts have specifically recognized that inattentive teen driving, and the resultant heightened risk of causing an accident, are foreseeable. See, e.g. , Riddick v. Jim Hay Co. , 45 Cal.App.3d 464, 119 Cal.Rptr. 546, 551 (1975) (noting "the incontrovertible fact that young drivers tend to be inattentive and reckless"); Martinelli v. City of Chicago , 371 Ill.Dec. 112, 989 N.E.2d 702, 712 (Ill. Ct. App. 2013) ("[I]t is well known that people do various things that lead to distracted driving .... Stating the obvious, this era's drivers are distracted on a regular basis by their apparent need to remain in constant communication on their cell phones .... [N]o rational thinker could think such conduct would be legally unforeseeable.").
Contrary to the dissent's assertion, we announce no new rule of law today, much less "a major departure from our jurisprudence." Every organization active in Minnesota-whether for-profit, nonprofit, religious, fraternal, educational, or otherwise-has long been subject to the black-letter common-law rule that it may be liable for the negligence of others if its own conduct creates a foreseeable risk of injury to a foreseeable plaintiff.[5] Today we apply that rule in the procedural posture of this case: summary judgment.
As we did in two recent cases involving the issue of duty of care in the context of summary judgment, we decide today that *207 foreseeability is at least a close call, meaning that summary judgment on the element of duty was not appropriate and the case should have been tried. See Senogles , 902 N.W.2d at 48 ; Montemayor , 898 N.W.2d at 633. Nothing in our decision prevents the district court from deciding by trial whether the facts show misfeasance or nonfeasance. And nothing in our decision prevents the school from arguing at trial the specific elements of negligence: that the school had no duty because its conduct did not create a foreseeable risk of injury to Fenrich; that the school did not breach a duty; and that the school's conduct was not the direct and proximate cause of the injuries.
CONCLUSION
For the foregoing reasons, we reverse the decision of the court of appeals.
Reversed.
Dissenting, Anderson, J., Gildea, C.J.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.
DISSENT

The team had a website that the coaches used to convey information to students and parents throughout the season. The website, authorized by the school's athletic director, bore the school's logo and colors. The school manual provided that use of the school's logo "instantly identif[ies] a communication or material as from, or of, this [s]chool."

Another occupant of the vehicle told police that he believed there was a 70 percent chance that T.M. playing with his phone was a cause of the accident.

The Eighth Circuit decided Gylten in 2001, long before we filed several significant decisions addressing duty-of-care and foreseeability issues in negligence cases. See, e.g. , Senogles v. Carlson , 902 N.W.2d 38 (Minn. 2017) ; Montemayor v. Sebright Prods., Inc. , 898 N.W.2d 623 (Minn. 2017) ; Doe 169 v. Brandon , 845 N.W.2d 174 (Minn. 2014) ; Domagala v. Rolland , 805 N.W.2d 14 (Minn. 2011).

Whether an alleged tortfeasor's "own conduct" is misfeasance or nonfeasance is a question of law. See Brower v. N. Pac. Ry. Co. , 109 Minn. 385, 124 N.W. 10, 11 (1910) (deciding that a railroad's undertaking was an act of misfeasance, and not one of nonfeasance, assuming the facts stated in the complaint). But when there are genuine issues about what the defendant did or the responsibilities it assumed, a court may not be able to decide the question by summary judgment on a paper record.

Thus, the dissent's concern that, once school lawyers with "gimlet eyes" read this opinion, they will cause school-affiliated organizations to disband is overwrought. Our decision merely applies a long-established rule of law to some unusual facts; specifically, how a school may have exposed itself to liability by seeking, simultaneously, to sponsor-and yet not sponsor-its athletic team's out-of-town trip.