LILLEHAUG, Justice.
*372 In this case of first impression, we must decide whether a hospitalist's alleged decision to deny a patient admission to a hospital may constitute professional negligence. We conclude that it may.
This case arises out of an interaction between employees of two Minnesota health systems. A nurse practitioner in one system sought to have a patient admitted to the hospital of the other system. Admission was allegedly denied by a hospitalist. Three days later, the patient died.
The patient's son sued for malpractice. The district court and a divided panel of the court of appeals concluded that, as a matter of law, the hospitalist owed no duty of care to the patient because no physician-patient relationship had been established. We reverse and remand.
FACTS
On August 8, 2014, Susan Warren, age 54, arrived at the Essentia Health clinic in Hibbing. She complained of abdominal pain, fever, chills, and other symptoms. Nurse practitioner[1] Sherry Simon ordered a series of tests to determine the nature of Warren's illness.
The test results showed that Warren had unusually high levels of white blood cells, as well as other abnormalities. These results led Simon to believe that Warren had an infection and needed to be hospitalized. Simon prepared a letter advising Warren's employer that Warren "was unable to attend work ... due to illness and hospitalization." Simon then called Fairview Range Medical Center to seek Warren's admission to the local hospital. Simon's call was randomly assigned to Dr. Richard Dinter, who was one of three Fairview hospitalists[2] on call that day.
Simon and Dinter were employed by different health systems. Because Essentia did not have a hospital in Hibbing, it was standard practice for Simon and other Essentia healthcare professionals to seek hospitalization *373 of their patients at the Fairview hospital. As Simon explained, she would call the hospital, be assigned to one of the on-call hospitalists, "present the case, and [the hospitalist] would either admit or tell [Essentia staff] a different type of plan."
Simon's call to Dinter lasted approximately ten minutes. They disagree about which diagnostic information Simon shared with Dinter. Simon says that she shared both the abnormal test results and Warren's symptoms; Dinter says that Simon shared only some of the test results. Simon says that the conversation with Dinter took place after urinalysis results became available in the early afternoon; Dinter says that the conversation took place "in the late morning or noon," and that Simon did not share any urinalysis results. Simon says that she specifically requested that Warren be hospitalized; Dinter says that Simon only asked him whether Warren should be hospitalized.
Simon and Dinter disagree not only about what information Simon conveyed, but also about how Dinter responded. They agree that Dinter told Simon that the cause of Warren's abnormal test results was likely diabetes, and that Simon should get that issue under control and see Warren the following Monday. Simon says that Dinter told her that Warren did not need to be admitted to the hospital. Dinter disagrees, saying that he responded "to what end[?]" to a question as to whether Warren should be admitted. Simon says she asked whether diabetes could actually be the source of the elevated white blood-cell count, and that Dinter responded that it could. Simon says she asked this question because it was the first time someone had told her that out-of-control diabetes could cause a high white-cell count. Dinter says Simon asked only "what about the blood sugar" and that he replied "it's probably a Type 2 diabetes."
After speaking with Dinter, Simon met with Dr. Jan Baldwin, who served as Simon's collaborating physician at Essentia.[3] Simon met with Baldwin because she still felt Warren should be hospitalized and wondered whether Baldwin might be able to help make that happen. Baldwin concurred that diabetes could be responsible for Warren's elevated white blood-cell count.
After speaking with Dinter and meeting with Baldwin, Simon met with Warren, who was still at the clinic. According to Simon, she told Warren that Simon had spoken with a hospitalist, who felt that hospital admission was not needed. Simon then discussed the diabetes diagnosis with Warren, prescribed diabetes and pain medication, scheduled a follow-up appointment, and sent her patient home. Three days later, Warren's son found her dead in her home. An autopsy concluded that the cause of death was sepsis caused by an untreated staph infection.
*374 On March 7, 2016, Warren's son sued Dinter and Fairview,[4] alleging that Dinter had been professionally negligent in the care and treatment of Warren, including advising Simon that Warren did not require hospitalization. The complaint further alleged that the negligence directly caused Warren's death, and that Fairview was liable under a theory of respondeat superior.
Dinter and Fairview moved for summary judgment, arguing that Dinter owed no duty of care to Warren because Simon had called Dinter only "for his thoughts as a hospitalist" and, therefore, he had "provided his reactions ... as a professional courtesy" to Simon. They also argued that Dinter's acts or omissions were not the proximate cause of Warren's death.
Along with their motion for summary judgment, Dinter and Fairview filed affidavits which contained the opinions of each side's medical expert. The plaintiff's expert was Dr. Benjamin Whitten, a board-certified physician in internal medicine practicing with Abbott Northwestern General Medicine Associates with expertise as a hospitalist. Whitten opined that Dinter's actions breached the standard of care for a hospitalist. He also opined that, had Warren been hospitalized for evaluation and treatment, it was highly likely that her infection would have been diagnosed and treated, and that she would have survived with no significant disability.
The defendants' expert was Dr. Meghan Walsh, a board-certified physician in internal medicine, a practicing hospitalist at Hennepin County Medical Center, and an associate professor at the University of Minnesota Medical School. Walsh opined that Dinter's actions were consistent with the standard of care for a hospitalist and that Warren's death was not caused by any negligence on his part. She also opined that, even if Warren had been admitted to the hospital on the day Simon called Dinter, it is unlikely and doubtful that Warren would have survived her infection.
The district court granted Dinter's and Fairview's summary-judgment motion on the issue of duty, concluding that the relationship between Simon and Dinter was "in the nature of an informal conversation between medical colleagues and did not create a doctor patient relationship" between Dinter and Warren. The district court concluded that "there [was] a fact question regarding causation," and denied summary judgment on proximate cause.
Warren's son appealed, arguing that, as a matter of law, a physician-patient relationship is not necessary for Dinter to have a duty to Warren. The court of appeals, in a divided, unpublished decision, affirmed the district court, holding that there was no duty because there was no physician-patient relationship. Warren v. Dinter , No. A17-0555, 2018 WL 414333, at *3, 5 (Minn. App. Jan. 16, 2018). The court of appeals did not reach the issue of proximate cause. Id. at *5. Judge Hooten dissented, reasoning that the district court should have denied summary judgment because, viewing the evidence in the light most favorable to the non-moving party, there was a duty because the harm was foreseeable. Id. at *6. We granted review.
ANALYSIS
This is an appeal from an order granting summary judgment. Such an order "is appropriate when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law." Senogles v. Carlson , 902 N.W.2d 38, 42 (Minn. 2017). We review a grant of summary *375 judgment de novo. Commerce Bank v. W. Bend Mut. Ins. Co. , 870 N.W.2d 770, 773 (Minn. 2015). "In conducting this review, 'we view the evidence in the light most favorable to the nonmoving party ... and resolve all doubts and factual inferences against the moving parties.' " Fenrich v. Blake School , 920 N.W.2d 195, 201 (Minn. 2018) (quoting Rochester City Lines Co. v. City of Rochester , 868 N.W.2d 655, 661 (Minn. 2015) ). As we have emphasized repeatedly, summary judgment is " 'inappropriate when reasonable persons might draw different conclusions from the evidence presented.' " Montemayor v. Sebright Prods., Inc. , 898 N.W.2d 623, 628 (Minn. 2017) (quoting Osborne v. Twin Town Bowl, Inc. , 749 N.W.2d 367, 371 (Minn. 2008) ).
This case involves a claim of professional negligence, specifically medical malpractice. See Kohoutek v. Hafner , 383 N.W.2d 295, 303 (Minn. 1986) ; see also Molloy v. Meier (Molloy II ), 679 N.W.2d 711, 717 (Minn. 2004) ("A medical malpractice action is based on principles of tort liability for negligence...."). Physicians are "required to possess only the skill and learning possessed by the members of [their] profession in good standing in [their] locality and to exercise that skill and learning with due care." Manion v. Tweedy , 257 Minn. 59, 100 N.W.2d 124, 129 (1959). As in all negligence actions, "the existence of a duty running [from the defendant] to the plaintiff is a prerequisite" to a finding of malpractice liability. Molloy II , 679 N.W.2d at 717. This case turns on whether Dinter owed Warren a duty of care.
Both the district court and the court of appeals held that there was no duty based on the idea that, as a matter of law, a physician-patient relationship is a necessary predicate for a doctor to owe a duty of care. The court of appeals relied on its own precedent in Molloy v. Meier (Molloy I ), 660 N.W.2d 444, 450 (Minn. App. 2003), aff'd , 679 N.W.2d 711 (Minn. 2004), and Peterson v. Saint Cloud Hosp. , 460 N.W.2d 635, 638 (Minn. App. 1990). Warren , 2018 WL 414333, at *2. These decisions require that we examine whether such a relationship is a necessary element of a malpractice claim.
I.
To be sure, most medical malpractice cases involve an express physician-patient relationship. And a physician-patient relationship is a necessary element of malpractice claims in many states.[5] But we have never held that such a relationship is necessary to maintain a malpractice action under Minnesota law. To the contrary: when there is no express physician-patient relationship, we have turned to the traditional inquiry of whether a tort duty has been created by foreseeability of harm. Two cases-one a century old and the other much more recent-are illustrative: Skillings v. Allen , 143 Minn. 323, 173 N.W. 663 (1919), and Molloy II , decided in 2004.
In Skillings , a doctor advised the parents of a girl he was treating for scarlet fever that she was no longer contagious and that they could visit her at the hospital and then take her home. 173 N.W. at 663. The doctor's advice was wrong and the parents became ill. Id. The district court *376 overruled a demurrer to the complaint, and the doctor appealed. Id. We affirmed, concluding that, regardless of any physician-patient relationship, the doctor owed the parents a duty because his advice "exposed them to danger if they acted on the advice, and defendant was bound to know that they would be likely to follow his advice." Id. at 664. All people, including professionals, we reasoned, are "responsible for the direct consequences of [their] negligent acts whenever [they are] placed in such a position with regard to another that it is obvious that if [they do] not use due care in [their] own conduct [they] will cause injury to that" third party. Id. at 663-64.
In Molloy II , three physicians examined a developmentally disabled child to determine the cause of her disability. 679 N.W.2d at 713-14. The child's mother believed that the cause could be genetic, and wanted to determine the likelihood of conceiving another similarly disabled child. Id. at 714-15. The treating physician ordered a battery of genetic testing, including for what was subsequently discovered to be the cause of the child's developmental disability: Fragile X syndrome. Id. at 714. But the Fragile X test was never conducted. Id.
When relaying the negative results of the test battery, the treating physician did not inform the mother that the Fragile-X test had not been conducted. Id. Two other specialists also omitted this vital information. Id. at 714-15. The mother later became pregnant and gave birth to another child who had Fragile-X syndrome. Id. at 715. Later tests showed the same result for the mother and her first child. Id.
The mother brought a professional negligence claim against the doctors and their employers. Id. The professionals argued that the children's parents were not patients, and thus there was no duty. Id. We determined that "a physician's duty ... extends beyond the patients to biological parents who foreseeably may be harmed by a breach of that duty." Id. at 719. Applying "the principles of negligence law set forth in Skillings ," we concluded that "the duty arises where it is reasonably foreseeable" that injury would follow "if the advice is negligently given." Id.
In both cases, we focused on foreseeability of harm to a particular third party, without regard to the existence of a physician-patient relationship. Skillings and Molloy II teach us that a duty arises between a physician and an identified third party when the physician provides medical advice and it is foreseeable that the third party will rely on that advice. Skillings , 173 N.W. at 664 (explaining that the doctor "was bound to know that [the parents] would be likely to follow his advice."); see also Molloy II , 679 N.W.2d at 719.
We have applied the same principle to legal professionals. In Togstad v. Vesely, Otto, Miller & Keefe , Joan Togstad met with an attorney to discuss a potential medical malpractice claim on behalf of her husband, John. 291 N.W.2d 686, 689-90 (Minn. 1980) (per curiam). The attorney took notes and asked questions as Togstad told her story, and then said "he did not think [she] had a legal case." Id. at 690. Relying on this statement, the Togstads did not pursue the claim for some time. Id. When Joan Togstad decided to investigate the claim again, she learned that the statute of limitations had run. Id. In response to a legal malpractice claim, the attorney and his firm argued that there was no attorney-client relationship between Togstad and the attorney and, therefore, that he and the firm owed her no duty of care.
We held that there was a duty, based on foreseeability of harm. The duty attached, we said, when legal advice was given "under *377 circumstances which made it reasonably foreseeable to [the attorney] that Mrs. Togstad would be injured if the advice were negligently given." Id. at 693.
In other words, although there was not an explicit attorney-client relationship, the attorney still owed Togstad a duty "derived from the professional relationship." Molloy II , 679 N.W.2d at 717. It was reasonable for Togstad and her husband to rely on the attorney's professional advice and foreseeable that both would be harmed if the advice was negligent. Id. at 718. We relied on Togstad 's reasoning in Molloy II , and it is applicable here, as well.
The court of appeals' decisions requiring a physician-patient relationship rest on an incorrect reading of Skillings . In McElwain v. Van Beek , the court of appeals attempted to distinguish Skillings , saying it was "narrow in scope and based upon the contractual relationship between the physician and the parents who employed him to care for their daughter...." 447 N.W.2d 442, 446 (Minn. App. 1989) (emphasis added), rev. denied (Minn. Dec. 20, 1989). This conclusion misapprehends the holding in Skillings , which explicitly rejected the contractual relationship test and relied instead on foreseeable reliance and harm. 173 N.W. at 664 ("[I]t is of little practical consequence whether we call [the] duty contractual or noncontractual," because the duty arises in part because "[t]he health of the people is an economic asset" and "[t]he law recognizes its preservation as a matter of importance to the state."). Indeed, in Molloy II , we rejected McElwain 's unduly limited view of Skillings . We acknowledged the "claim that recent court of appeals decisions limit the application of Skillings ," but explained that "[a]lthough the [ Skillings ] court based its holding on the lack of a doctor-patient relationship, it may have reached the same result under a foreseeability analysis." 679 N.W.2d at 717 n.5.
Therefore, for 100 years in Minnesota, a physician has had a legal duty of care based on the foreseeability of harm. Although ours is the minority rule, it is by no means unique.[6] This rule has served Minnesota sufficiently well, and we have no compelling reason to overrule our precedent.[7]
II.
Against this legal backdrop, we turn next to the question of whether it was foreseeable that Dinter's decision not to admit Warren, if made negligently, would be relied on by Warren, through Simon, *378 and cause her harm. As in Molloy II , we must "apply the principles of negligence law set forth in Skillings and Togstad and conclude that the duty arises where it is reasonably foreseeable" that Warren "would be injured if the advice is negligently given." 679 N.W.2d at 719. "When determining whether a danger is foreseeable, we 'look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility.' " Foss v. Kincade , 766 N.W.2d 317, 322 (Minn. 2009) (quoting Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A. , 582 N.W.2d 916, 918 (Minn. 1998) ).
"Foreseeability in the context of duty is an issue that is ordinarily reviewed de novo." Doe 169 v. Brandon , 845 N.W.2d 174, 178 (Minn. 2014). "In close cases, the issue of foreseeability should be submitted to the jury." Domagala v. Rolland , 805 N.W.2d 14, 27 (Minn. 2011) ; see also Fenrich , 920 N.W.2d at 205 ; Senogles , 902 N.W.2d at 48 ; Montemayor , 898 N.W.2d at 629 ; Foss , 766 N.W.2d at 322-23 ; Whiteford , 582 N.W.2d at 918. Viewing all of the evidence in the light most favorable to Warren, as we must, we cannot conclude, as a matter of law, that it was unforeseeable to Dinter that Warren would rely on his actions and be harmed by a breach of the standard of care.
As the record shows, Simon, the nurse practitioner, was unable to admit Warren to the hospital on her own. Dinter, on the other hand, was one of Fairview's hospitalists-a physician who worked exclusively in the hospital setting and was specifically tasked with making admission decisions. We must accept as true Simon's account that Dinter decided that Warren did not need to be admitted to the hospital. The medical experts retained by the parties appear to agree that there is a standard of care for a hospitalist in such circumstances.
Viewing the record in a light favorable to Warren, it is reasonable to conclude that Dinter knew, or should have known, that his decision whether or not to admit a prospective patient, based on his own medical judgment,[8] would be relied on by Simon and her patient. He also knew, or should have known, that a breach of the applicable standard of care could result in serious harm. Finally, there is sufficient evidence in the record-the opinion of appellant's medical expert that the applicable standard of care was, in fact, breached and caused Warren's death-to survive a summary-judgment motion. Summary judgment, therefore, should not have been granted.
Dinter and Fairview argue that the conversation between Simon and Dinter was a so-called "curbside consultation" and, therefore, cannot subject them to liability. They, amici, and the dissent all warn that making physicians liable for curbside consultations would harm patients by chilling beneficial interaction among professionals. Indeed, many states exempt third-party doctors from malpractice liability when their colleagues engage them in curbside consultations to "informally solicit one another's opinions" regarding their patients. Victor R. Cotton, Legal Risks of "Curbside" Consults , 106 Am. J. Cardiology 135, 135, 136 (2010); see also, e.g. , Irvin v. Smith , 272 Kan. 112, 31 P.3d 934, 941 (Kan. 2001) ("A physician who gives an 'informal opinion,' however, at the request of a treating physician, does not owe a duty to the patient because no physician-patient relationship is created.").
*379 We have not previously addressed the legal status of curbside consultations, and we have no need to do so here. Viewed in the light most favorable to Warren, this interaction was neither a curbside consultation nor what Dinter and Fairview characterized as a "professional courtesy." Simon did not know Dinter and, as the dissent notes, they had no preexisting professional relationship. Unlike a curbside consultation, Simon did not contact Dinter to pick a colleague's brain about a diagnosis. In fact, she had already memorialized her own diagnosis in a letter to Warren's employer. Instead, Simon called Dinter pursuant to Fairview's protocol for hospital admissions. Consistent with that protocol, Fairview randomly assigned her to Dinter so that Fairview, through its gatekeeper, could make a medical decision on whether to accept and admit a new patient.
According to Warren's evidence, Dinter did just that. Rather than merely offering informal observations or advice as a courtesy, Dinter exercised his power, on behalf of Fairview, to admit or not admit Warren to the only hospital in her locality. Viewing the evidence in the light most favorable to Warren, Dinter, as the gatekeeper, made the medical decision not to open the gate for Warren. Whether or not he breached the standard of care for a hospitalist when making that decision remains to be decided.
The dissent acknowledges that a physician may have a duty in the absence of a physician-patient relationship, but it tries to cabin that duty in two ways. First, the dissent asserts that Dinter could not have reasonably foreseen that, once Dinter made the medical decision not to admit Warren, Simon would then "fail to make reasonable treatment decisions regarding her patient." Translating, the dissent is saying that, even if a doctor in the role of hospital gatekeeper breaches the standard of care and bars a patient from the only local hospital, the doctor can reasonably assume-as a matter of law, no less-that this decision will have no consequence. Why? Because other professionals will never defer to it, and will instead find a way around it.
We disagree with the dissent's position. If the dissent were correct, hospitalists would have a standard of care for hospital admissions (as the parties' experts agree they do), yet have no legal obligation to meet it. Instead, it is well-established that a physician's breach of the standard of care is not excused by another's later breach. See, e.g. , Couillard v. Charles T. Miller Hosp., Inc. , 253 Minn. 418, 92 N.W.2d 96, 99 (1958) ; Benesh v. Garvais , 221 Minn. 1, 20 N.W.2d 532, 533 (1945), overruled on other grounds , 253 Minn. 418, 92 N.W.2d 96, 103 (1958) ; Goss v. Goss , 102 Minn. 346, 113 N.W. 690, 692 (1907).
Second, the dissent tries to limit a physician's duty to situations in which the physician and the patient have had direct personal contact. But our standard for a physician's duty is not based on personal contact; it is based on foreseeability of harm, which means the "risk to another or to others within the range of apprehension." Molloy II , 679 N.W.2d at 719 (quoting Connolly v. Nicollet Hotel , 254 Minn. 373, 95 N.W.2d 657, 664 (1959) (quoting Palsgraf v. Long Island R.R. Co. , 248 N.Y. 339, 162 N.E. 99, 100 (1928) )). Thus, in Molloy II , we held that even a physician who had "never met with or spoke to [one of the plaintiffs,] Kimberly Molloy," Molloy I , 660 N.W.2d at 449, nonetheless owed her a duty. 679 N.W.2d at 719. Similarly, in Togstad , although the lawyer met with Joan Togstad, we affirmed the award of damages for her injured husband, who never met with the attorney. 291 N.W.2d at 695. See also *380 Schendel v. Hennepin Cty. Med. Ctr. , 484 N.W.2d 803, 808 (Minn. App. 1992), rev. denied (Minn. July 16, 1992) (determining that a physician-patient relationship existed, even if the consulting neurologists did not see the patient).
In this case, Warren, through Simon, sought entry through Fairview's gatekeeper, Dinter. Viewing the facts in the light most favorable to Warren, she was well within Dinter's "range of apprehension." Through Simon, Warren was advised of Dinter's decision. It is a reasonable inference that Dinter must have known, or should have known, that a negligent decision not to admit Warren could harm her.
Our decision today should not be misinterpreted as being about informal advice from one medical professional to another. This case is about a formal medical decision-whether a patient would have access to hospital care-made by a hospital employee pursuant to hospital protocol. We decide only that hospitalists, when they make such hospital admission decisions, have a duty to abide by the applicable standard of care.
Although our decision on the duty of an admitting hospitalist is a matter of first impression, in another respect this case is not in the least novel. The procedural posture before us is a grant of summary judgment on the issue of duty. In that respect, we have simply revisited other recent cases on the standard for summary judgment on the issue of duty. See Fenrich , 920 N.W.2d at 205-07 ; Senogles , 902 N.W.2d at 48 ; Montemayor , 898 N.W.2d at 633. Simply put: when duty depends on foreseeability, and the material facts regarding foreseeability are disputed, or there are differing reasonable inferences from undisputed facts (a "close call"), summary judgment on the element of duty should be denied and the negligence claim, including the issue of foreseeability, should be tried. See Fenrich , 920 N.W.2d at 207. Whether Warren's son will be able to establish all of the elements of professional negligence, or whether Dinter and Fairview will prevail on one or more elements, is for the fact-finder to decide at trial.
CONCLUSION
For the foregoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings.
Reversed and remanded.
Dissenting, Anderson, J., Gildea, C.J.
DISSENT

A nurse practitioner is one of several classes of advanced-practice registered nurses. See Minn. Stat. § 148.171, subds. 3, 13 (2018). "Nurse practitioner practice" includes "diagnosing [and] treating ... acute and chronic illnesses and diseases." Id. , subd. 11(3) (2018).

Dinter testified that a hospitalist "is a physician who provides care for patients in the setting of a hospital." The term was coined in 1996. Robert M. Wachter & Lee Goldman, The Emerging Role of "Hospitalists" in the American Health Care System , 335 New Eng. J. Med. 514 (1996). By 2010, 60 percent of hospitals reported that they used hospitalists. Adam C. Schaffer, et al., Liability Impact of the Hospitalist Model of Care , 9 J. Hosp. Med. 750, 750 (2014). "Hospitalists are central players in the inpatient or observation hospitalization decision." Soc'y of Hosp. Med., The Hospital Observation Care Problem: Perspectives and Solutions from the Society of Hospital Medicine 4 (2017).

At the time these events took place, Baldwin and Simon worked together under a collaborative management agreement. Minnesota law then required advanced-practice registered nurses, including nurse practitioners, to "practice within a health care system that provide[d] for ... collaborative management." Minn. Stat. § 148.171, subds. 3, 11, 13 (2012). Collaborative management was defined as an "agreed-upon plan between an advanced practice registered nurse and one or more physicians ... that designates the scope of collaboration necessary to manage the care of patients." Id. , subd. 6 (2012). The Legislature subsequently removed this requirement. Act of May 13, 2014, ch. 235, §§ 9, 42, 2014 Minn. Laws 723, 726, 743. Baldwin was not Simon's supervisor, and Simon, as a nurse practitioner, had the authority, based on her training and licensing, to provide direct care. Simon did not, however, have the ability to admit patients to the Fairview hospital.

Before beginning this action, Warren's son sued Essentia Health for the alleged malpractice of its employees, Simon and Baldwin. That case has been settled.

See, e.g. , Bubb v. Brusky , 313 Wis.2d 187, 756 N.W.2d 584, 591 (Wis. Ct. App. 2008) ("Whether a suit for malpractice will lie against a particular physician depends upon whether there is a physician-patient relationship between that physician and the plaintiff."), rev'd on other grounds , 321 Wis.2d 1, 768 N.W.2d 903 (2009) ; see also 1 David W. Louisell & Harold Williams, Medical Malpractice § 8.03(1) n.1 (2018) (outlining other cases in which courts have so ruled).

See Ritchie v. Krasner , 221 Ariz. 288, 211 P.3d 1272, 1279 (Ariz. Ct. App. 2009) ("A duty may arise even in the absence of a formal relationship."); Plowman v. Fort Madison Cmty. Hosp. , 896 N.W.2d 393, 401 (Iowa 2017) ("Although this contractual physician-patient relationship is sufficient to establish a duty, it is not required." (citing J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C. , 589 N.W.2d 256, 260 (Iowa 1999) )); Horton v. Or. Health & Sci. Univ. , 277 Or.App. 821, 373 P.3d 1158, 1162 (2016) ("We begin with, and quickly dispose of, defendants' contention that a medical-malpractice claim must always be premised on the existence of a special status-that is, a physician-patient relationship-between the plaintiff and the defendant. We have repeatedly rejected that argument ...."); Oblachinski v. Reynolds , 391 S.C. 557, 706 S.E.2d 844, 846 (2011) ("However, a doctor-patient relationship is not required in every legal action against a medical provider. Limited circumstances exist where a reasonably foreseeable third party can maintain a suit against a physician for malpractice." (citation omitted)).

Under the principles of stare decisis, "[w]e are extremely reluctant to overrule our precedent," and "require[ ] a 'compelling reason' to do so." State v. Lee , 706 N.W.2d 491, 494 (Minn. 2005) (quoting Oanes v. Allstate Ins. Co. , 617 N.W.2d 401, 406 (Minn. 2000) ).

This was not a situation where admission to a hospital was denied for lack of facilities or medical staff, or for some other reason not related to a medical judgment.