**MBL CONTRACTING CORP., Plaintiff,**

v.

**KING WORLD PRODUCTIONS, INC. Defendant.**

**No. 99 Civ. 11095(NRB).**

United States District Court, S.D. New York.

June 1, 2000.

Thomas J. Rossi, Canfield, Venusti, Madden & Rossi, L.L.P., Douglaston, NY, for Plaintiff.

Ira N. Glauber, Glen Berger, Jaffe & Asher, New York City, for Defendant.

## OPINION AND ORDER

BUCHWALD, District Judge.

Plaintiff MBL Contracting Corporation ("plaintiff" or "MBL") brings this quasi-contract action to recover for unpaid construction work performed under contract with Unitel Video, Inc. ("Unitel"), on premises owned by Unitel. After Unitel filed for bankruptcy, plaintiff brought this suit against Unitel's tenant, King World Productions, Inc. ("defendant" or "King World"), alleging one cause of action based in *quantum meruit* and unjust enrichment, and two more based on its alleged status as an intended third-party beneficiary of King World's agreement with Unitel. Currently pending is defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or for summary judgment pursuant to Rule 56. Defendant also seeks sanctions against plaintiff's counsel under Rule 11 of the Federal Rules. For the reasons stated herein, defendant's motion for summary judgment is granted. Defendant's motion for sanctions is denied.

## BACKGROUND

According to plaintiff's Amended Complaint ("Am.Comp.") and supporting affidavits, MBL is a "general contractor performing both public and private work in and around the City of New York." Affidavit in Opposition of Morton Levitin, dated May 3, 2000 ("Levitin Aff.") ¶ 2. In April of 1998, MBL's "longstanding customer" Unitel asked it "to perform extensive renovation work" at 515 West 57th Street, New York, New York. *Id.* ¶¶ 1,2; Am. Comp. ¶ 3. One month earlier, Unitel had entered into a "Production Services Agreement" with King World to allow King World "to use and occupy the premises as a television studio and for related office purposes." Am. Comp. ¶¶ 10, 11. The Production Services Agreement provides "that Unitel was to perform certain 'Initial Alterations' at the premises in accordance with [a] design proposed by King World's architect." *Id.* ¶ 12; Production Services Agreement, appended to Defendant's Notice of Motion ("Def.Mot.") as Ex. D ("PSA"). These "initial alterations" are the same renovations contracted for by MBL. Levitin Aff. ¶¶ 2–4. Although the cost of the alterations was to be borne by Unitel, Am. Comp. ¶ 13, King World paid a premium to Unitel in the form of higher lease payments for use of the property. Levitin Aff. ¶¶ 9, 12.

Unitel submitted plans to MBL for the alterations drawn up by its own architect on April 6, 1998. Am. Comp. ¶ 4. MBL then submitted a "lump sum proposal" for the work in the amount of $787,292.55, and Unitel accepted. Levitin Aff. ¶ 4. When MBL began construction, its employees found representatives of King World on site. *Id.* King World's representatives, the lawful tenants of the premises, "directed MBL's forces during construction," Am. Comp. ¶ 5, and "made numerous, almost daily requests for additions and changes to the work." Levitin Aff. ¶ 5. However, the understanding during this entire period was that "Unitel would pay for the work." *Id.* ¶ 6.

Throughout 1998, MBL submitted invoices to Unitel for payment. Levitin Aff. Ex. 2. Apparently, many of these invoices were never paid. MBL then filed a series of liens against the property in August of 1999, naming Unitel as "the person by whom the lienor was employed, and to whom the lienor furnished materials and for whom the lienor performed professional services." Def. Mot. Ex. F. However, Unitel filed for bankruptcy September 2, 1999, and MBL subsequently filed a claim against Unitel in that forum. Def. Mot. Ex. F. Plaintiff filed this suit against King World on November 5, 1999. MBL has never provided any proof that it ever sought payment from King World before that date.

On January 20, 2000, King World's counsel sent a letter to this Court requesting permission to dismiss plaintiff's complaint and setting forth the authority for such a motion. I held an initial pretrial conference on February 1, 2000 and granted plaintiff permission to file an amended complaint before allowing King World to proceed with its motion. Plaintiff filed its amended complaint March 7, 2000, restating its initial quasi-contract claim and adding claims based on its alleged third-party beneficiary status. Defendant brought the instant motion April 10, 2000.

## DISCUSSION

### I. *Motion to Dismiss and Summary Judgment Standards*

Defendant has both moved to dismiss and for summary judgment. However, we address only the motion for summary judgment inasmuch as plaintiff has filed only a bare bones amended complaint, forcing us to rely on plaintiff's supporting affidavits to complete its version of the facts.

A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor. *See id.* Relying solely on plaintiff's factual proffer and the documents integral to that proffer, though, we find that summary judgment is appropriate.

### II. *Quantum Meruit and Unjust Enrichment*

Plaintiff maintains that even though it clearly contracted with Unitel to perform construction services at 515 West 57th Street, that it is entitled to recover the costs of that construction from King World under a theory of *quantum meruit* and unjust enrichment. Plaintiff's Memorandum in Opposition ("Pl.Mem.") at 3–6. Plaintiff cites *U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.*, 38 F.3d 1289 (2d Cir.1994) for the proposition that there are certain circumstances under which a subcontractor "could obtain payment directly from" a

property owner after the general contractor, "with which it had privity, filed for bankruptcy."[1] Pl. Mem. at 3. Plaintiff argues by extension that King World, like the owner in *U.S. East,* is bound to the contract between itself and Unitel because King World had been on site and allegedly requested that certain work be performed.

However, as the Second Circuit explained in *EFCO Corp. v. U.W. Marx, Inc.,* 124 F.3d 394, 401 (2d Cir.1997), the holding of *U.S. East* is a "narrow exception" to the general rule that "a landowner is not liable to a subcontractor for work performed on the owner's property in furtherance of the subcontract." *See also U.S. East,* 38 F.3d at 1297 ("A person who has conferred a benefit on another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of the performance of the third person.") (quoting Restatement of Restitution § 110 (1937)).

■ In *EFCO,* the Second Circuit affirmed the dismissal of such a claim where the plaintiff did not allege that it conditioned the provision of its services on an obligation by the defendant to pay. 124 F.3d at 401. Similarly, in *American Steel Erectors, Inc. v. Lehrer McGovern Bovis, Inc.,* this Court (Kaplan, J.) reiterated that "the owner in such circumstances may be held liable to a subcontractor only 'if the owner has agreed to pay the general contractor's debt or if the circumstances surrounding the parties' dealings can be found to have given rise to an obligation to pay.'" No. 94 Civ. 6253, 1997 WL 122761 at 3 (S.D.N.Y. Mar. 18, 1997) (quoting *U.S. East,* 38 F.3d at 1298). Judge Kaplan found in *American Steel Erectors* that such a claim may not be maintained where the plaintiff fails to allege that the defendant gave the plaintiff reason to believe that it would pay the bankrupt party's debt.

■ *U.S. East* is clearly inapposite to the case at bar. In *U.S. East,* the bankrupt party was, in a sense, an intermediary for payments from the defendant to the plaintiff. When the intermediary divulged that financial problems could threaten the project, the defendant had allegedly offered to "get [the plaintiff] paid" if plaintiff finished the work and conceded that it had offered several alternative ways to insure that its payments found their way directly to the plaintiff. 38 F.3d at 1293–94. As a result, the defendant was held liable for services plaintiff would not have otherwise rendered had it not been for the representations of defendant.

Here, MBL acknowledges that its understanding throughout was "that Unitel would pay for the work." Levitin Aff. ¶ 6. At all times, MBL "submitted bills to Unitel directly for this work as instructed." *Id.* ¶ 7, Ex. 3. It was only after the work was performed, and Unitel had gone bankrupt, that MBL sought any payment from King World. There is simply no evidence that MBL performed the work pursuant to its contract with Unitel with any expectation that King World would pay it for its services. As such, its claim under *U.S. East* is subject to dismissal on its face. *See American Steel Erectors,* 1997 WL 122761 at 3.

Moreover, King World was Unitel's tenant. Unlike the chain of dependant relationships between an owner and a subcontractor, King World had a contract with and an obligation to Unitel separate from MBL's construction contract. The benefit of improvements to the property adhere permanently to the owner of the property whereas the benefits to King World exist only during the duration of the lease. As

---

1. Although *U.S. East* actually concerned a secondary subcontractor's attempt to seek recovery from a general contractor after the primary subcontractor defaulted, the Second Circuit relied on New York state case law concerning the more familiar owner to general contractor to subcontractor alignment. 38 F.3d at 1298. For the sake of convenience, and because there is no material distinction, we will continue to analogize this case to that set of facts.

plaintiff admits, the costs associated with the renovation of 515 West 57th Street were already reflected in the rent that King World negotiated to pay, and continues to pay, to Unitel for the right to use the premises. *See* Levitan Aff. ¶ 9 ("I understand now that King World has made payment for this work as part of the Lease payments it made and continues to make."). After King World's lease ends, the benefit of MBL's work will end for King World and continue for the property's owner. To the extent that King World paid for the improvements in the former of higher rent, it would be duplicative for King World to pay for the repairs twice, first in the rent paid to Unitel and then again in damages to MBL. As such, MBL's claim for *quantum meruit* and unjust enrichment must be dismissed.

### III. *Third–Party Beneficiary Claims*

■ Plaintiff next argues that King World is obligated to pay MBL because of its status as a third-party beneficiary of the Production Services Agreement. Pl. Mem. at 8–9. "A third party is an intended beneficiary where either (1) no one other than the third party can recover if the promisor breaches the contract or (2) the language of the contract otherwise evidences an intent to permit enforcement by third parties." *Piccoli A/S v. Calvin*

*Klein Jeanswear Co.*, 19 F.Supp.2d 157, 162 (S.N.D.Y.1998) (internal citations and quotation marks omitted). In this case, plaintiff relies on two provisions of the agreement: (1) Section 4, which assigns responsibility to King World for "Other Alterations" beyond the initial set of repairs,[2] and (2) Section 9, the Production Services Agreement's indemnity provision.[3] Neither clause is availing.

■ First, the Production Services Agreement between King World and Unitel distinguishes between the "initial alterations" to be paid for by Unitel and completed by May 29, 1998, and subsequent "other alterations" for which King World would be responsible. PSA § 4. Plaintiff takes the position that all work performed outside the four corners of its "lump sum proposal" falls into the category of "other alterations" and that, at a minimum, King World should be held liable for the work that its representatives "authorized" outside the initial proposal. However, as a matter of contract law, plaintiff's claim must fail. With the exception of one specific $10,000 payment from King World to Unitel, Levitin Aff. Ex. 3, plaintiff has provided no evidence that Unitel construed the requests to MBL by King World to constitute "other alterations" under the contract. MBL had submitted invoices for the so-called "other alterations" to Unitel

2. Section 4(D) of the Production Services Agreement provides in full that King World "shall not make any alterations, additions, installations or improvements (collectively 'Alterations') to the Facility. In the event that [King World] requires alterations to the Facility, [King World] shall request that Unitel make such Alterations, and Unitel shall not unreasonably withhold its consent to make such Alterations provided that [King World] pays the full cost to Unitel of making such Alterations as well as, at Unitel's option (reasonably exercised), the cost of removing such Alterations and restoring the Facility at the end of the Term. All 'costs' referenced in this paragraph shall mean Unitel's actual cost."

3. Section 9 of the Production Services Agreement provides in relevant part, "each party agrees to defend, indemnify, and hold harmless ('Indemnitor') the other party ('Indemnitee') against any and all claims, actions, or

damages, including reasonable attorneys' fees (collectively, 'Claims') (i) of every kind and nature, arising out of the use of or in connection with the Facility, including without limitation, for property damage, injury or death to persons, that are caused by any acts or omissions of any of its officers, employees, independent contractors or any performers the Indemnitor employs or (ii) for breach, violation or non-performance of any of its representations, warranties, and covenants set forth in this Agreement. This indemnity in favor of Unitel also includes any acts or omissions of any personnel provided by Unitel, to the extent such personnel are acting under [King World's] direction and control. In addition, King World shall indemnify and hold Unitel harmless from any Claims arising out of or in connection with the content or exhibition of the Programs."

throughout 1998 without any evidence of objection by Unitel. Without proof that Unitel had a different interpretation of the agreement than King World, MBL's conclusory allegations cannot control the meaning of the contract. It is axiomatic that "where the parties [to a contract] have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." Restatement (Second) of Contracts, § 201(1).

In addition, MBL cannot claim the status of intended third-party beneficiary under the "other alterations" provision. MBL argues that "MBL was the intended and only beneficiary of the extra work that was ordered by King World." Pl. Mem. at 9. However, the first test for third-party beneficiary status is not met because, as discussed above, there is no evidence that King World, as promisor, has breached its obligation to Unitel to compensate it for "other alterations." *See, e.g., Piccoli*, 19 F.Supp.2d at 162 (dismissing an alleged third-party beneficiary claim that could have been brought by a party to the contract but was not); *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419, 432 (S.D.N.Y.1998) (same). Nor does the language of the contract otherwise evidence an intent to permit enforcement by third parties because it requires King World to pay the costs of all such "other alterations" to Unitel and only authorizes recovery by Unitel itself. *Id.* at 164 (finding that a third party cannot establish intended beneficiary status where it is "apparent from the face of the contract that the parties intended to limit to themselves the ability to enforce the agreement"). *Cf. Artwear, Inc. v. Hughes*, 202 A.D.2d 76, 84, 615 N.Y.S.2d 689, 694 (1st Dep't 1994) (noting that "it is well settled that the subcontractor or supplier of a general contractor on a construction project is not invested with third-party beneficiary status" and are, instead, "incidental beneficiaries") (citations omitted). As such, the provision cannot confer on MBL the status of an intended third-party beneficiary. Moreover, the fact that King World paid Unitel the additional $10,000 and not MBL is additional proof that MBL must look to Unitel for its payment.

■ Second, the indemnity provision of the Production Services Agreement indemnifies Unitel against "all claims, actions, or damages" arising out of "acts or omissions" by "King World's personnel or of any personnel provided by Unitel, to the extent such personnel are acting under [King World's] direction and control." PSA § 9. Plaintiff maintains that its employees constitute such personnel provided by Unitel under the control of King World, and that, therefore, the indemnity provision authorizes it to proceed directly against King World. Pl. Mem. at 9. Such a reading of the indemnity provision is strained at best. The intent of the indemnity agreement is clearly to protect Unitel, not third-party claimants. Again, MBL cannot meet its burden of establishing its intended third-party beneficiary status because the indemnity clause was clearly drafted to allow recovery by Unitel, not *only* MBL. *Piccoli*, 19 F.Supp.2d at 162. In fact, § 9 does not evidence any intent to permit enforcement by third parties. *See id.* at 164. It would be a wholly illogical result were this Court to construe the intent of a general indemnity provision to bind one party to a contract action to all the debts of the other. As such, plaintiff's second and third claims must be dismissed as well.

## IV. *Rule 11 Sanctions*

Finally, the decision of whether to award sanctions pursuant to Rule 11 is subject to the Court's discretion. *See Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d Cir.1999). Although we have found an award of summary judgment to be appropriate in this case, we also find that MBL's complaint was not frivolous and that it was not clear under existing legal precedent that it had no chance of success or that it was filed solely for the purpose of harassment. *See Kalnit v. Eichler*, 99 F.Supp.2d 327, 344 (S.D.N.Y.2000). Accordingly, the motion for Rule 11 sanctions is denied.

498

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment in favor of the defendant and close the above-captioned case.

**IT IS SO ORDERED.**