*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1769**
**A22-1770**

In the Matter of the Trust established under
the Pooling and Servicing Agreement relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage
Pass-Through Certificates, Series 2007-C30.

**Filed January 8, 2024**
**Affirmed**
**Klaphake, Judge**[*]

Ramsey County District Court
File Nos. 62-TR-CV-19-19, 62-TR-CV-19-33

Shannon M. Awsumb, Arthur G. Boylan, Joseph R. Richie, Anthony Ostlund Louwagie
Dressen & Boylan P.A., Minneapolis, Minnesota (for appellants Torchlight Value Fund
LLC and Torchlight Debt Opportunity Fund II, LLC)

Aaron P. Knoll, John B. Orenstein, Holley C. M. Horrell, Greene Espel PLLP,
Minneapolis, Minnesota; and

Blair Adams (pro hac vice), Quinn, Emanuel, Urquhart & Sullivan LLP, New York, New
York (for appellant CWCapital Cobalt Vr Ltd.)

Michael C. McCarthy, Maslon LLP, Minneapolis, Minnesota; and

Kevin J. Biron (pro hac vice), Morgan, Lewis & Bockius LLP, New York, New York (for
respondent U.S. Bank National Association)

Sharon R. Markowitz, Stinson LLP, Minneapolis, Minnesota; and

Gregory A. Cross (pro hac vice), Venable LLP, Baltimore, Maryland (for respondent
CWCapital Asset Management LLC)

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

Mark G. Schroeder, Jeremy D. Schildcrout, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota (for respondent DW Partners, LP)

Norman M. Abramson, Jessica L. Kometz, Bassford Remele a Professional Association, Minneapolis, Minnesota; and

Thomas E. Redburn (pro hac vice), Lowenstein Sandler LLP, New York, New York (for respondents Palomino Master Ltd. and Azteca Partners LLC)

Karla M. Vehrs, William P. Wassweiler, Ballard Spahr LLP, Minneapolis, Minnesota; and

Matthew P. McGuire (pro hac vice), Alston & Bird LLP, Raleigh, North Carolina (for respondent Wells Fargo Bank, N.A.)

Elinor H. Murarova, Duane Morris LLP, Chicago, Illinois (for respondent C-III Asset Management LLC (n/k/a Greystone Servicing Company LLC))

Considered and decided by Slieter, Presiding Judge; Larson, Judge; and Klaphake, Judge.

## NONPRECEDENTIAL OPINION

**KLAPHAKE**, Judge

These consolidated appeals arise from related trust-instruction proceedings brought by respondent Wells Fargo Bank, N.A. and respondent U.S. Bank National Association. The trust-instruction proceedings were filed after the trust's servicers distributed and later clawed back funds from the trust's junior certificate holders to fund reserves for the trust's anticipated litigation expenses. The primary issue below was whether the trust's governing contract permitted the creation of those reserves. The district court determined that it did and granted summary judgment against the junior certificate holders. Because we discern no error in the district court's construction of the contract or consideration of the record, we affirm.

# FACTS

These appeals involve a commercial mortgage-backed securities trust (the trust) governed by a contract referred to as the Pooling and Servicing Agreement (PSA). The following facts are undisputed.

## Background

At its inception, the trust received a pool of assets consisting mainly of loans backed by commercial real estate mortgages. Investors could then buy certificates entitling them to principal and interest payments made on the commercial mortgages. The trust's investors fell into different classes, with more senior certificate holders being entitled to the trust's distributions before more junior certificate holders. The appellants, Torchlight Value Fund LLC, Torchlight Debt Opportunity Fund II, LLC, and CWCapital Cobalt Vr Ltd., are junior certificate holders (the juniors). Among the respondents are senior certificate holders DW Partners, LP, Palomino Master Ltd., and Azteca Partners LLC (the seniors). At relevant times, respondent U.S. Bank National Association (U.S. Bank) was trustee and respondents CWCapital Asset Management LLC (CWCAM) and Wells Fargo Bank, N.A. (Wells Fargo) were the trust's special servicer and master servicer, respectively.

## The Creation of the December 2018 Reserves

This dispute arose in December 2018, after the trust paid its certificate holders pursuant to the PSA's distribution provisions. Shortly after the distribution, CWCAM instructed Wells Fargo to reserve $38 million for anticipated litigation expenses. The reserves were for potential exposure of parties indemnified under the PSA, including

3

CWCAM, and for associated legal fees and expenses. Wells Fargo complied and established a reserve fund (the December 2018 Reserves) by "clawing back" $38 million that had been distributed to the juniors.

Once the pending litigations were resolved, approximately $28 million of the previously clawed back funds became available for distribution. The juniors demanded that the unused December 2018 Reserves be redistributed according to the original December 2018 distribution, whereas the seniors demanded the unused amount be distributed at the next distribution date in accordance with the PSA's waterfall provision, which provided that the seniors would be paid before the juniors. If the seniors prevailed, the juniors would receive none of the leftover December 2018 Reserves.

Amid this dispute, U.S. Bank filed a trust-instruction proceeding (TIP), seeking an order confirming that the creation of the December 2018 Reserves did not constitute an Event of Default under the PSA. Wells Fargo also filed a TIP, seeking confirmation that the unused reserves should be treated like any other available trust funds and distributed pursuant to the waterfall provision, as the seniors urged.

The juniors and seniors filed cross-motions for summary judgment. The district court granted the seniors' motion, determining that the December 2018 Reserves were authorized by the PSA and that their creation did not constitute an Event of Default. The district court filed two orders issuing judicial instructions that resolved the TIPs. The district court ordered that all actions taken by the trust's servicers in relation to the creation of the December 2018 Reserves were permitted by the PSA. The district court also ordered that the unused reserves be distributed by Wells Fargo on the next distribution date, and

4

that the PSA did "not require Wells Fargo to distribute any portion of the unused Reserved Amounts based on how such funds would have been distributed in December 2018." The juniors appeal.

**DECISION**

The juniors contend that the district court erred in granting summary judgment to the seniors because (1) the PSA did not unambiguously authorize the creation of the December 2018 Reserves, (2) if the PSA is ambiguous, the district court erroneously relied on disputed extrinsic evidence and should have sent the case to trial, and (3) genuine issues of material fact on the necessity of the December 2018 Reserves precluded a grant of summary judgment. The juniors also argue that the grant of summary judgment was an erroneous basis for (4) the district court's conclusion that there was no event of default, and (5) the district court's resulting judicial instruction orders that resulted in the distribution of the remaining reserve funds.

Before addressing these arguments, we identify our standard of review. We review de novo a grant of summary judgment "to determine whether there are genuine issues of material fact and whether the district court erred in its application of the law." *Montemayor v. Sebright Prods., Inc.*, 898 N.W.2d 623, 628 (Minn. 2017) (quotation omitted); *see also* Minn. R. Civ. P. 56.01. "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002).

In interpreting the meaning of the PSA, the district court applied substantive New York law. The parties agree that the substantive issues in this case are governed by New

5

York law in accordance with a choice-of-law provision in the PSA. We uphold choice-of-law provisions, so we will interpret and apply the law of New York here. *See Combined Ins. Co. of Am. v. Bode*, 77 N.W.2d 533, 536 (Minn. 1956).

We conclude that the district court correctly applied the law and determined that there were no material disputes of fact. Accordingly, we affirm.

## I.   The district court did not err by concluding that the PSA authorized the creation of reserves for anticipated legal expenses.

The juniors first argue that the plain language of the PSA is unambiguous and does not provide for the creation of reserves for future legal expenses. The seniors agree that the PSA is unambiguous, but they counter that the authority to create reserves for future legal expenses is reasonably implied by the express terms of the PSA. Joining the seniors' position are U.S. Bank, Wells Fargo, and CWCAM.

To resolve this dispute, we must interpret the contract according to New York law and determine whether the PSA is ambiguous. Whether a contract is ambiguous presents a question of law. *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). "The best evidence" of the parties' intent is "what they say in their writing." *Id.* "[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently." *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E.2d 404, 406 (N.Y. 1996). Rather, an ambiguity exists when a contract's language "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who

6

has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396-97 (2d Cir. 2009) (quotations omitted) (applying New York law).

The PSA's express terms establish the following: payments collected by the trust are deposited in a "certificate account." Prior to monthly distributions to certificate holders, certain funds, known as the "Available Distribution Amount," are moved from the Certificate Account to a "Distribution Account." The Available Distribution Amount is defined to exclude amounts reimbursable pursuant to section 3.05. Section 3.05 permits the master servicer to make withdrawals from the certificate account to "pay itself, the [s]pecial [s]ervicer, the [d]epositor, or any of their respective [agents] . . . pursuant to Section 6.03." Section 6.03 states that "the [s]pecial [s]ervicer shall be indemnified and held harmless by the [t]rust . . . against any loss, liability or reasonable expense incurred in connection with [the PSA]." On distribution dates, the paying agent then disburses the Distribution Account to certificate holders. Finally, subject to the terms of the PSA, "the [m]aster [s]ervicer and [s]pecial [s]ervicer each shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable."

The juniors contend that these provisions only entitle the trust's servicers to indemnification against expenses incurred and do not permit the master servicer and special servicer to create reserves for future litigation expenses. The district court determined that these provisions prioritize trust servicers' right to indemnification over certificate holders'

right to distributions. The district court added that these provisions necessarily imply "the ability to hold back and segregate funds necessary to meet the indemnification obligations of the PSA." We agree with the district court's conclusions for several reasons.

First, we are not persuaded by the juniors' argument that the PSA's silence on the permissibility of the December 2018 Reserves is dispositive. "That a particular provision has not been expressly stated in a contract does not necessarily mean that no such covenant exists." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978). When interpreting a contract, courts are not limited to the contract's literal language; they also may consider "whatever may be reasonably implied therefrom." *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982). This principle reflects the reality that a contract governing complex matters such as these cannot possibly contemplate every possible circumstance. The PSA provisions discussed above reasonably imply that the trust's servicers have broad authority to ensure that the trust meets its obligations to indemnify various parties before distributions are made. Indeed, one of the juniors' experts admitted that "reserves are created in the [commercial mortgage-backed securities] industry even under circumstances that are not expressly stated in the PSA." The expert opined that the right to make reserves is "implied in the definitions of deposits and withdrawals into the certificate account." The juniors' own expert's statements betray the overly formalistic nature of their argument.

Second, the juniors' interpretation would nullify the indemnification clause as the trust's assets dwindled. "[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or

8

effect." *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) (quotation omitted). A contract should not be interpreted in a way that produces an absurd or commercially unreasonable result. *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010). Even in the light most favorable to appellants, after the December 2018 distribution, the trust's remaining assets appeared to consist of just five loans. And several individuals testified at depositions that the remaining loans, despite having substantial unpaid balances, were not performing, leaving the trust's servicers unsure as to whether proceeds from those loans could sufficiently fund the anticipated expenses identified by CWCAM. Without the ability to make future reserves amid this uncertainty, the trust would be unable to guarantee its obligation to indemnify its servicers, rendering the indemnification provision of the PSA without force or effect. The juniors admit that making future reserves is permissible when an entire trust is liquidated, or when a trust is in bankruptcy or demonstrably insolvent. We are not persuaded that there is a meaningful distinction between those cases and this case, in which several individuals testified at depositions that the trust was "winding down." The juniors' interpretation would result in a commercially unreasonable result, leaving the trust incapable of satisfying its indemnification obligations as its assets dwindled.

Third, the juniors' interpretation is at odds with the expectations of the *actual* parties to the PSA. The PSA includes signature lines only for the master servicer, special servicer, trustee, and depositor. Here, the master servicer (Wells Fargo), special servicer (CWCAM), and trustee (U.S. Bank) agree that the PSA unambiguously authorized the creation of the December 2018 Reserves. "It is axiomatic that 'where the parties to a

contract have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.'" *MBL Contracting Corp. v. King World Prods., Inc.*, 98 F. Supp. 2d 492, 497 (S.D.N.Y. 2000) (quoting Restatement (Second) of Contracts § 201(1)). An interpretation offered by "strangers to the contract" will not control when it is at odds with an interpretation of the contract that "has been illumined by conduct on the part of the signatories." *See In re Prudential Lines Inc.*, 158 F.3d 65, 79 (2d Cir. 1998).

Here, the deposition testimony of the PSA's parties demonstrates their understanding that the PSA permitted the creation of reserves for future legal expenses. U.S. Bank's designee testified that CWCAM was permitted to take reserves in connection with the looming litigations. CWCAM's CEO testified that CWCAM was "100 percent" certain that it would be indemnified under the PSA. CWCAM's senior vice president testified that the PSA authorized the master servicer to make withdrawals from trust accounts to pay future indemnification expenses. And Wells Fargo's designee testified that the PSA permits the master servicer to conclusively rely on a certificate from the special servicer requesting the creation of a reserve. Meanwhile, one of the juniors' designees could not point to a provision in the PSA prohibiting the December 2018 Reserves and noted that he did not know the PSA "in depth." Because the parties to the PSA agree that it authorizes reserves for future litigation expenses, we are reluctant to displace the parties' expectations with those of the juniors, who are "strangers to the contract." *See id.*

Based on this undisputed evidence in the summary judgment record, we conclude that the district court did not err in determining that the PSA unambiguously authorized the December 2018 Reserves. Because we conclude that the PSA is unambiguous, we do not reach any of the juniors' arguments that assume that the PSA is ambiguous.

**II.     The juniors fail to show that there is a material dispute of fact regarding the prudence and necessity of the December 2018 Reserves.**

Next, the juniors contend that summary judgment was inappropriate because there are disputed material facts regarding the prudence and necessity of the December 2018 Reserves. The juniors assert that "no party performed any analysis at the time of the taking of the [r]eserves." Even when construing the facts most favorably to the juniors, we conclude that the district court did not err and that there are no materially disputed facts precluding summary judgment on this issue.

The juniors do not cite to the PSA or any caselaw in asserting that the trust's servicers needed to determine the necessity of the December 2018 Reserves prior to creating them. Based on the juniors' argument in their motion for summary judgment, it appears their necessity argument is based entirely on a CWCAM expert's assertion that reserves are appropriate "whenever they are necessary." The district court determined that "it was both desirable and necessary" to create the December 2018 Reserves in light of the uncertainties surrounding "whether remaining assets would generate sufficient future cash flow." Based on our review of the record, there is no genuine dispute of material fact on this issue.

11

CWCAM's CEO testified at his deposition that he consulted CWCAM's attorneys to estimate the upcoming litigation expenses, which included alleged damages, prejudgment interest, and legal costs. CWCAM's CEO knew the trust's cashflow at that point was "de minimis." CWCAM's expert testified that it would have been very difficult to speculate whether the trust's remaining assets would have been able to satisfy the upcoming litigation expenses. After CWCAM instructed Wells Fargo of the looming litigation exposure, Wells Fargo concluded that the trust's remaining cashflows were insufficient. CWCAM's CEO testified that the trust was going to have "a very difficult time making its payments going forward." Absent any provision in the PSA or caselaw mandating a certain level of analysis, we discern no genuine dispute of material fact regarding whether CWCAM and Wells Fargo sufficiently determined that the December 2018 Reserves were necessary based on these facts.

Nor are we persuaded by the juniors' reliance on the fact that the trust's cashflow in the 13 months after December 2018 totaled $51 million. The juniors contend that, had "any analysis" been done, the servicers would have determined that the December 2018 Reserves were unnecessary. The juniors' argument is entirely speculative and assumes that CWCAM and Wells Fargo could have predicted the future cashflow, despite the previously referenced evidence that both parties believed the trust's cashflow could not fund future litigation costs. "Summary judgment is not to be avoided simply because there is some metaphysical doubt as to a factual issue." *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993). "Mere speculation, without some concrete evidence, is not enough to avoid summary judgment." *Id.* The juniors fail to

12

point to any concrete evidence tending to show the trust's servicers should have, or even could have, made a more accurate determination of the necessity of the December 2018 Reserves. Accordingly, we discern no error in the district court's determination that there was no material dispute regarding the necessity of the December 2018 Reserves.

The remaining issues raised by appellants depend on a conclusion that the district court's grant of summary judgment was erroneous. Because we conclude that the district court did not err, we do not reach these issues.

**Affirmed.**